UNITED STATES of America,
Plaintiff–Appellee,

v.

Irving L. NAPUE, Defendant–Appellant.

No. 85–2642.

United States Court of Appeals,
Seventh Circuit.

Argued June 1, 1987.

Decided Nov. 19, 1987.

As Amended on Denial of Rehearing and
Rehearing En Banc Jan. 21, 1988.

Jerold S. Solovy, Robert W. Kent, Jr., Jenner & Block, Chicago, Ill., for defendant-appellant.

Anton R. Valukas, U.S. Atty., Stephen L. Heinze, Asst. U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS, CUDAHY, Circuit Judges, and GRANT, Senior District Judge.[*]

* Honorable Robert A. Grant, *Senior District Judge,* Northern District of Indiana, is sitting by designation.

## 1314

CUDAHY, Circuit Judge.

Defendant Irving Lopez Napue was convicted by jury verdict of ten counts of possession with intent to distribute cocaine, 21 U.S.C. § 841(a)(1), one count of conspiracy to possess with intent to distribute heroin and cocaine, 21 U.S.C. § 846, one count of use of a telephone to cause and facilitate the unlawful distribution of cocaine, 21 U.S.C. § 843(b), and two counts of making fraudulent statements on his income tax returns, 26 U.S.C. § 7206(1). The jury acquitted Napue on one count that alleged that his narcotics trafficking constituted a continuing criminal enterprise, 21 U.S.C. § 848. The district court sentenced Napue to a prison term of eighteen years followed by five years of probation and a special parole term of life. Napue now appeals his conviction.

### I.

Napue alleges that the district court made the following errors that require reversal of his conviction: (1) his constitutional rights were violated by *ex parte* communications between the government and the district court; (2) the evidence of Napue's dangerousness presented by the government in the *ex parte* communications was insufficient to justify any limitation on the government's pretrial disclosure obligations; (3) the district court abdicated to the government the determination of the government's pretrial discovery obligations; (4) the prosecutor violated a court order by referring in rebuttal argument to a fact not in evidence; (5) the district court erred in denying Napue's motion to suppress guns and a scale seized during the August 1, 1979 search of his hotel room; (6) the district court erred in denying Napue's request for an evidentiary hearing on his motion alleging that the government prosecuted this case vindictively; and (7) the government's evidence at trial of Napue's alleged conspiracy varied fatally from the indictment.

We will describe the facts that are relevant to each of Napue's claims along with our discussion and disposition of the claims. We will briefly describe here some of the central evidence offered at trial of Napue's involvement in the possession and distribution of narcotics. Napue's trial lasted eleven weeks and Napue was the only defendant.

In March of 1973, Napue was released from federal prison where he had served a sentence for narcotics offenses. Upon his release, Napue returned to Chicago and was on parole until August of 1974. During his period of parole, he was required to report all income and sources of income to his parole officer. At trial, Napue's parole officer testified that Napue reported a little over $4000 income for March through December 1973 and approximately $3000 for January through July 1974. Napue reported to his parole officer that he was employed at a jewelry store, but the owner of that store, Armando Martinez, testified at trial that Napue never worked for him. Rather, according to Martinez, Napue purchased jewelry from Martinez every week or two during the time Napue claimed to be working for him. Napue paid for the jewelry in cash and usually offered Martinez small amounts of cocaine. The government introduced evidence that Napue claimed in an application for homeowner's insurance to own $25,000 in furs and $24,000 in jewelry purchased in 1973–74, and that during that same time Napue purchased an interest in six cabs and a house.

Martinez further testified that Napue asked him to find a customer to purchase cocaine from Napue. Martinez agreed to try to do so and he later arranged for the sale of an ounce of cocaine on May 10, 1974, by Napue to government informant Mario Torres and an undercover federal agent, Gustavo Vazquez. Torres also testified at trial that this sale took place.

In September 1974, Napue and his wife purchased a house in Las Vegas, Nevada, which was put in Napue's sister-in-law's name. Napue purchased an answering-beeper service from October 1974 through January 1982 and was billed for it first at the address of the house he purchased in September and later at various other Las Vegas addresses.

Charles Wilson testified that he began selling heroin on Chicago's West Side in July or August 1975. He began purchasing heroin for resale directly from Napue in late 1976, at which time he was also purchasing heroin from his brother, Robert "Rabbit" Parker, who also purchased heroin from Napue. From late 1976 through early 1977, Wilson purchased heroin from Napue in quantities of eight to ten ounces per transaction; from early 1977 through the summer of 1978, Wilson purchased heroin from Napue in one-pound quantities for $21,000 on almost a weekly basis. Later, Napue supplied Wilson with smaller quantities of heroin, about five to ten ounces every week or two. Wilson testified that Harry "Dog" Cannon worked for him as his assistant and that by the end of 1978 Wilson had turned over most of his operation to Cannon. Wilson directed Cannon to purchase heroin from Napue. In 1979, Wilson saw Cannon sell a car to Napue which Napue paid for with heroin and money.

Robert Gaston testified that he bought and sold drugs with Rabbit Parker in 1980 and 1981. Gaston testified that he and Parker purchased cocaine and heroin from Napue on a regular basis from the summer of 1980 through October 31, 1981, the day before Parker was killed. After Parker's death, Gaston continued purchasing narcotics from Napue through October 1982.

Myron Bing Matsumoto testified that he purchased one-ounce quantities of cocaine from Napue on four separate occasions in 1980.

Several government witnesses testified concerning Napue's sources of cocaine. Edward Fields and two people who worked for Fields at that time, John Unger and Myron Bing Matsumoto, testified that they sold large quantities of cocaine to Napue from February or March 1979 through October 1979. On at least one occasion, Unger provided cocaine to Napue prior to being paid. Robert Bridges testified that he also sold cocaine to Napue beginning in about May 1979, when he was introduced to Napue by their mutual attorney, James Cutrone. Bridges gave cocaine to Napue in advance of being paid on at least one occasion. Bridges' cocaine sales to Napue ended sometime in 1981; following a conversation Bridges had with Parker, Bridges quoted Napue a high price for cocaine in order to stop dealing with him.[1]

The government also introduced evidence that Napue's wife, Joyce Smith, and several other women purchased more than thirty guns for use in connection with Napue's narcotics transactions. Employees at the gun stores that sold the guns to the women testified that Napue accompanied the women during at least several of these purchases and that Napue and his wife occasionally practiced at the shooting range in the back of one of the gun stores. Police officers testified that during arrests some of these guns were recovered from Napue and from women who were with Napue. Testimony and evidence at trial indicated that these women, in addition to purchasing guns for Napue, actively participated in his drug transactions. Some of the drug dealers who testified to doing business with Napue also testified that they saw Napue carrying guns.

II.

Prior to his trial, Napue repeatedly sought additional information from the government about the charges against him. On April 4, 1984, Napue filed a motion to dismiss the conspiracy count of the indictment for vagueness, or, in the alternative, for a bill of particulars providing the names of Napue's alleged co-conspirators and the nonconspirators with whom he allegedly did business, as well as the details of each of the alleged overt acts of the conspiracy. On that same date, Napue filed a motion for disclosure of the identities of others suspected by the government to have complicity in the alleged offenses. On January 8, 1985, Napue filed a Rule 16 motion for discovery and inspection that sought, among other things, a list of all witnesses

---

1. Napue's address book, which was seized when he was arrested in May of 1981, included the names and numbers of many of the persons who testified to dealing drugs with Napue, including John Unger, "C.W.," Rabbit Parker, Dog Cannon and Bobby Bridges.

whom the government intended to call at trial.

The government objected to supplying Napue with some of the information he requested on the ground that Napue was a dangerous individual who would pose a threat to the safety of some of the government's witnesses if they were identified to Napue. On two occasions during the pretrial proceedings, the government and the district court engaged in *ex parte* communications regarding Napue's alleged dangerousness as it related to his discovery requests. On November 19, 1984, the government submitted to the district court a document describing the basis for its belief that Napue's dangerousness justified limiting pretrial disclosure of the identity of some of the government's witnesses. On March 13, 1985, the district court held an *ex parte* conference from which Napue was excluded and at which the government made additional specific allegations of Napue's dangerousness. In each of these two instances, Napue was given notice prior to its occurrence that the *ex parte* communication was to be made, but was denied the opportunity to review or rebut the government's allegations.

Napue claims on appeal that this *ex parte* procedure violated "his Due Process rights to rebut these allegations and to have his alleged dangerousness determined as accurately as possible; and his Sixth Amendment rights to have counsel interview witnesses in preparation for trial and to have counsel present his defense at trial." Napue's Reply Brief at 1. Napue further argues that the violations in his case caused substantial prejudice and therefore constitute reversible error. Napue urges this court to hold that a criminal defendant has a constitutional right to participate in the process of determining his dangerousness for discovery purposes unless the government can demonstrate a compelling state interest in support of *ex parte* communications that outweighs the defendant's interests in participation and disclosure. Napue argues that courts should be required to permit the defendant to rebut the government's allegations of

dangerousness whenever possible and to the greatest extent possible.

■■■ We agree with Napue that *ex parte* communications between the trial court and the prosecution in a criminal case are to be greatly discouraged and should be permitted only in very limited circumstances. We do not agree, however, that the Constitution requires the stringent standards advocated by Napue. Rather, we believe that the trial court has the discretion to determine when and to what extent *ex parte* proceedings are appropriate in establishing, based on the defendant's alleged dangerousness, the limitations that ought to be placed on discretionary discovery. We will review the trial court's actions under an abuse of discretion standard, keeping in mind that *ex parte* proceedings are disfavored and also considering any compensating measures taken by the court to ensure the adequacy of the discovery allowed. In addition, we will proceed on the premise that any *ex parte* submission by the government must be made in good faith and prepared with reasonable care.

### A.

■■■ The Supreme Court has stated that the due process clause has "little to say" concerning the amount of discovery to which parties in a criminal trial are entitled. *Wardius v. Oregon,* 412 U.S. 470, 474, 93 S.Ct. 2208, 2212, 37 L.Ed.2d 82 (1973). Moreover, "[t]here is no general constitutional right to discovery in a criminal case." *Weatherford v. Bursey,* 429 U.S. 545, 559, 97 S.Ct. 837, 846, 51 L.Ed.2d 30 (1977). A criminal defendant does, of course, have some specific rights to pretrial discovery. For example, due process requires that the prosecution disclose evidence favorable to the defendant upon request where the evidence is material to guilt or punishment. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). A defendant is also entitled to a legally sufficient indictment that provides the defendant with adequate notice of the offense charged so that the defendant can prepare his or her defense. *United States*

*v. Hinkle,* 637 F.2d 1154, 1157 (7th Cir. 1981). Rule 16 of the Federal Rules of Criminal Procedure provides for additional pretrial discovery in criminal cases. *Bowman Dairy Co. v. United States,* 341 U.S. 214, 71 S.Ct. 675, 95 L.Ed. 879 (1951).

The law is clear, however, that the Constitution does not require that a defendant in a noncapital case be provided with a list of all prospective government witnesses. *See Weatherford,* 429 U.S. at 559, 97 S.Ct. at 845; *United States v. Bouye,* 688 F.2d 471, 473-74 (7th Cir.1982); *United States v. Harris,* 542 F.2d 1283, 1291 (7th Cir.1976), *cert. denied,* 430 U.S. 934, 97 S.Ct. 1558, 51 L.Ed.2d 779 (1977); *United States v. Jackson,* 508 F.2d 1001, 1005-08 (7th Cir.1975). Nor does Rule 16 entitle a defendant to this information. *Bouye,* 688 F.2d at 473-74; *Jackson,* 508 F.2d at 1006. In fact, Congress rejected a proposal that would have required the government and the defendant to exchange the names and addresses of their witnesses three days before trial. The conference committee expressed concern that such a requirement would discourage witnesses from testifying and would lead to "improper contact directed at influencing their testimony":

> The House version of the bill provides that each party, the government and the defendant, may discover the names and addresses of the other party's witnesses 3 days before trial. The Senate version of the bill eliminates these provisions, thereby making the names and addresses of a party's witnesses nondiscoverable. The Senate version also makes a conforming change in Rule 16(d)(1). The Conference adopts the Senate version.
>
> A majority of the Conferees believe it is not in the interest of the effective administration of criminal justice to require that the government or the defendant be forced to reveal the names and addresses of its witnesses before trial. Discouragement of witnesses and improper contact directed at influencing their testimony, were deemed paramount concerns in the formulation of this policy.

H.R.Conf.Rep. No. 94-414, 94th Cong., 1st Sess. 12, *reprinted in* 1975 U.S.Code Cong. & Admin.News 674, 713, 716.

Rule 16 allows a court to deny discovery of even the information that is expressly provided for by the rule. The court, at least in some instances, may base its decision to deny discovery on an *ex parte* showing by the government. Rule 16(d)(1) requires the court to seal and preserve the records of the *ex parte* communication for the appellate court in the event of an appeal:

(d) Regulation of Discovery.

(1) Protective and Modifying Orders. Upon a sufficient showing the court may at any time order that the discovery or inspection be denied, restricted, or deferred, or make such other order as is appropriate. Upon motion by a party, the court may permit the party to make such showing, in whole or in part, in the form of a written statement to be inspected by the judge alone. If the court enters an order granting relief following such an ex parte showing, the entire text of the party's statement shall be sealed and preserved in the records of the court to be made available to the appellate court in the event of an appeal.

Fed.R.Crim.P. 16(d). The Notes of the Advisory Committee on Rules that follow Rule 16 further discuss when a court should deny discovery, including in situations in which an *ex parte* communication concerning discovery would be appropriate. The notes to the 1974 amendment of Rule 16 state, "Although the rule does not attempt to indicate when a protective order should be entered, it is obvious that one would be appropriate where there is reason to believe that a witness would be subject to physical or economic harm if his identity is revealed." The notes further state that although *ex parte* proceedings generally "are disfavored and not to be encouraged," such proceedings nevertheless would be appropriate "if any adversary proceeding would defeat the purpose of the protective or modifying order. For example, the identity of a witness would be disclosed and the purpose of the protective order is to conceal that witness' identity."

■ Although the defendant in a criminal case has no right to a list of the government's witnesses to be called at trial, this court has held that a district court has the authority to require the government to provide the defendant with such a list. *Jackson*, 508 F.2d 1001. This authority is part of the court's "inherent power, exercisable under appropriate circumstances, to assure the proper and orderly administration of criminal justice." *Id.* at 1007. We have recognized that, where the government fears that disclosing a list of its witnesses would pose a threat to their safety, *ex parte* communications between the court and the government may be appropriate in determining whether or not the list should be provided:

> The defendants desired lists of witnesses from the Government. Defendant Bullock raises also this point in his supplemental brief. Defendants cannot obtain lists of Government witnesses as a matter of right, although the district court has discretionary power to order it to provide a list. *United States v. Jackson*, 508 F.2d 1001, 1006–07 (7th Cir.1975). The district court did not abuse its discretion by refusing to do so in this case. The Government did not wish to reveal this information because of physical danger to witnesses as well as the possibility of threats and intimidation. The sealed materials provided to the district court by the Government in support of its contentions regarding dangers to witnesses

amply establish that the Government's fears were not unwarranted. *Harris*, 542 F.2d at 1291. We have further held that a court's decision whether or not to order the government to produce a list of its witnesses is subject to review under an abuse of discretion standard. *Jackson*, 508 F.2d at 1007–08 (court did not abuse its discretion by ordering mutual disclosure of witnesses to be called at trial); *Harris*, 542 F.2d at 1291 (court did not abuse its discretion by refusing to order disclosure of government's witnesses to be called at trial).[2] A court has no authority, however, to order the government to produce statements of its witnesses prior to the time the government witnesses testify. *Id.*

Although we apply an abuse of discretion standard to a district court's use of *ex parte* proceedings in making determinations about nonmandatory discovery, the district court in exercising its discretion must bear in mind that *ex parte* communications are disfavored. They should be avoided whenever possible and, even when they are appropriate, their scope should be kept to a minimum. Courts have discussed in other contexts the dangers of allowing *ex parte* proceedings in criminal cases. *See, e.g., In re Taylor*, 567 F.2d 1183 (2d Cir.1977); *United States v. Miller*, 495 F.2d 362 (7th Cir.1974); *United States v. Solomon*, 422 F.2d 1110 (7th Cir.), *cert. denied*, 399 U.S. 911, 90 S.Ct. 2201, 26 L.Ed.2d 565 (1970); *United States v. Palermo*, 410 F.2d 468 (7th Cir.1969); *Haller v. Robbins*, 409 F.2d 857 (1st Cir.1969).[3] *Ex*

---

**2.** The Third Circuit reversed a district court's decision to order the government to provide the defendants with a list of the witnesses approximately one week prior to trial. *United States v. Higgs*, 713 F.2d 39, 44–45 (3d Cir.1983), *cert. denied*, 464 U.S. 1048, 104 S.Ct. 725, 79 L.Ed.2d 185 (1984). The Third Circuit found that the district court had abused its discretion in ordering the disclosure of the list where the government made an *ex parte* showing of "specific corroborated evidence of threats [to the witnesses] made by or through [the defendants]." *Id.* at 45.

**3.** Napue relies heavily on these cases which, in other contexts, establish stringent standards for the use of *ex parte* proceedings. Although we agree with the general objections to *ex parte* proceedings that are expressed in these opinions, we find that these cases are factually dis-

tinguishable and the standards they apply are inappropriate in the present case. None of these cases deals with *ex parte* proceedings involving pretrial discovery, an area that is peculiarly within the discretion of the district court. Also, these cases involve situations where the information disclosed in the *ex parte* communications would *never* be made available to the excluded party during the course of the proceeding in question. In contrast, in the discovery context presented here, the issue is when, not if, the information will be disclosed. Napue's counsel have been afforded access to a redacted transcript of the March 13, 1985 conference and the entire *in camera* narrative (subject to the stipulation that they not disclose to Napue or the public any information pertaining to the 1965 murder of a government agent). *See* Appellant's Motion to Supplement Record on Appeal.

*parte* communications between the government and the court deprive the defendant of notice of the precise content of the communications and an opportunity to respond. *In re Taylor*, 567 F.2d at 1187–88. These communications thereby can create both the appearance of impropriety and the possibility of actual misconduct. Even where the government acts in good faith and diligently attempts to present information fairly during an *ex parte* proceeding, the government's information is likely to be less reliable and the court's ultimate findings less accurate than if the defendant had been permitted to participate. "However impartial a prosecutor may mean to be, he is an advocate, accustomed to stating only one side of the case." *Robbins*, 409 F.2d at 859. An *ex parte* proceeding "places a substantial burden upon the trial judge to perform what is naturally and properly the function of an advocate." *Solomon*, 422 F.2d at 1119.

### B.

With the above guidelines in mind, we now consider whether the district court abused its discretion in allowing the two *ex parte* communications at issue here and in limiting discovery based in part on information obtained from them. We will also examine whether the government acted in good faith and with reasonable care in preparing the information provided in the *ex parte* proceedings.

The district court addressed Napue's request for additional pretrial discovery at a hearing on August 21, 1984. At that hearing, the court expressed concern that Napue would have difficulty preparing his defense without more specific information about what the government would attempt to prove at trial.[4] The government objected to providing Napue with all of the information he had requested, stating that some government witnesses were afraid of Napue and that it had evidence that Napue was indeed dangerous. The court agreed that the government's concern for the safety of its witnesses was a reasonable concern.[5] In an attempt to accommodate these competing interests, the court asked the government to provide the court with an *in camera* narrative describing the testimony and evidence it intended to introduce at trial as well as specific concerns it had about providing that information to Napue prior to trial.[6] The court stated

---

The cases cited by Napue, *United States v. Miller*, 495 F.2d 362, *United States v. Solomon*, 422 F.2d 1110, and *Haller v. Robbins*, 409 F.2d 857, all dealt with a defendant's right to be sentenced based on accurate information and the conflict with that right posed by sentencing on the basis of *ex parte* reports supplied by the government. The Second Circuit in *In re Taylor*, 567 F.2d 1183, considered the use of *ex parte* proceedings to deprive a grand jury witness of his right to counsel of his choice, his right to associate for the purpose of retaining legal representation and his attorney's right to practice his chosen profession. In *United States v. Palermo*, 410 F.2d 468, this court discussed the appropriate role of *ex parte* proceedings where such proceedings had been used to deprive a defendant of his right to a witness' true name, address and place of employment at the time of cross-examination.

**4.** The court stated:

My main concern is—and I don't care whether we are talking about it in terms of a bill of particulars or anything else—as I mentioned before, since we are talking about a charge of a criminal enterprise going on for more than eight years with a lot of specific transactions involved, as to specific transac-

tions, they certainly let him know exactly when and where and what as to those particular counts on the continuing criminal enterprise, the "repeatedly possess with intent to distribute and did distribute" and the "repeatedly used communication facilities" and the "repeatedly attempted to commit violations," without something more, unless you are talking about the "repeatedly" as being the matters that are in the other counts, it sure makes it difficult for defendant to know where you are coming from.

Tr. Aug. 21, 1984, at 360–61.

**5.** The court stated, "In any narcotics case involving charges of distribution of considerable amounts of illegal substances, the possible fears of witnesses is, on its face, a reasonable concern." Tr. Aug. 21, 1984, at 365.

**6.** The court stated:

... I appreciate the difficulties that you labor under if you really don't know where the government is coming from in terms of what's coming in, because you don't know what you are going to face.

....

And the government has, at this point, reasonable concerns about how much they can

that it would then be in a better position to rule on Napue's discovery requests.[7] Pursuant to this request, the government provided the court with a document on November 19, 1984, entitled "Government's Submission Outlining Probable Witnesses and Evidence at Trial In Camera under Seal" (the *"in camera* narrative").

The court stated at a hearing on February 26, 1985, that it had reviewed the *in camera* narrative "regarding the apprehensions of witnesses, and with specific names, and I think that they certainly provide a reasonable basis for people thinking that they should be concerned." Tr. Feb. 26, 1985, at 2. The following day, the court sent a memorandum to the government (but not to Napue) describing the type of discovery it felt should be provided to Napue and asking the government to supply the court with a proposed list of witnesses to be disclosed including "the names of as many witnesses as you feel you safely can." The government presented the court with its proposed discovery disclosure at a hearing on March 1, 1985. Tr. Mar. 1, 1985, at 2–11. The government asked the court first to review the document and then, if the court found it to be an appropriate response, to order the government to turn it over to Napue. Although the discovery disclosure did not contain all of the information outlined in the court's memorandum, the court noted that it contained "considerable further information" and ordered the government to give it to Napue. *Id.* at 9, 11.[8]

An *ex parte* communication between the government and the court also took place on March 13, 1985. The government's discovery disclosure stated that during 1979–80 "Napue also had other sources for cocaine through his attorney." At a hearing on March 13, 1985, Napue requested that the government identify the attorney mentioned and the witnesses who would be testifying concerning this matter. The government objected to providing this information, again expressing concern for the safety of its witnesses. The government requested an *ex parte* hearing with the court to explain further the basis for its objections. The court granted that request and on the same date held an *ex parte* hearing on the issue. Following the hearing, the court ordered the government to reveal the name of the attorney involved but not the witnesses.

■ The district court did not abuse its discretion in making the initial decisions to allow the *ex parte* proceedings. In each instance, the court was presented with a plausible argument by the government that providing Napue with the information requested would endanger its witnesses and deter them from testifying. Under such circumstances, the court acted reasonably in asking the government to explain and support its objections in an *ex parte* com-

---

disclose without causing prejudice to somebody.

Maybe having the government disclose it to me and then, with me knowing about it, talking about what can be disclosed that gives you a sufficient understanding of where they are coming from without putting anybody in jeopardy is a way to approach it.

Tr. Aug. 21, 1984, at 367–68.

7. The court stated:

At that point, I will be in a much better position to know, one, what the extent of it is, two, at least be able to think this [in] terms of, if I think the defendant needs more, how possibly it could be done so that the safety concerns are responded to.

Tr. Aug. 21, 1984, at 372.

8. Napue alleges that by so doing, the court "committed reversible error by abdictating to the prosecutors the determination of the government's pre-trial discovery obligations." Napue's

Brief at 57. Napue argues that the court did not read the discovery disclosure before ordering that it be given to Napue and that the court thereby allowed the government to determine the scope of its own pretrial discovery obligations. This allegation is premised on speculation. While Napue is correct that the court never expressly stated that it had read the discovery disclosure, the court also never stated that it had not. The court reviewed the document at least sufficiently to state that it contained "considerable further information." Tr. Mar. 1, 1985, at 9. Moreover, on subsequent occasions, the court discussed the discovery disclosure in a manner that suggested that the court was familiar with its contents. Under the circumstances, and particularly given the court's close attention throughout the proceedings to the adequacy of the discovery provided to Napue, we will not assume that the court did not review the discovery disclosure at some appropriate point.

munication. The court clearly benefited from having this information, but providing it simultaneously to Napue would have risked revealing the identities of the witnesses that the government sought to protect. As previously noted, courts have recognized circumstances such as these as justifying an *ex parte* proceeding, as do the notes to Rule 16. *See supra* pp. 1317–19.

A more difficult question is whether the court acted properly subsequent to each of the *ex parte* communications when it relied on the information provided in the *ex parte* communications to limit discovery without affording Napue an opportunity to respond to the allegations. The government's *in camera* narrative submitted to the court on November 19, 1984, contained a number of specific allegations of violent behavior by Napue. It described evidence that Napue was responsible for threatening, assaulting and murdering various informants and people close to them.[9]

At the March 13, 1985 *ex parte* hearing, the government explained to the court why it objected to providing Napue with additional information concerning its charge that Napue obtained cocaine from sources through his attorney. The government informed the court that Robert Bridges would testify at trial that he sold narcotics to Napue and that the first such transaction was arranged by James Cutrone, who was their mutual attorney. The government stated that it was hesitant to reveal Bridges as a witness because Bridges had recently received two threats in connection with his role as a possible government in-

formant. The government admitted to the court that it had no direct evidence that Napue was the source of the threats, but stated that it was investigating further and hoped to have Bridges in the Witness Protection Program very soon.

Absent any procedural problems, the allegations of Napue's dangerousness contained in the *ex parte* communications clearly are serious enough to support the limitations on discovery imposed by the district court. Although we decline to impose rigid requirements on a court's use of *ex parte* proceedings and instead will continue to apply an abuse of discretion standard of review, this case presents two potentially significant problems in the court's use of the *ex parte* communications.

First, the court did not permit Napue to respond to the government's charges. As mentioned above, this is not *per se* problematic and would be appropriate if, for example, allowing Napue to respond would require the court to reveal to Napue the identities of the witnesses whom the government was attempting to protect. Here, however, most of the government's allegations involved incidents of violent and threatening behavior by Napue that did not involve the witnesses whose identities the government sought to keep from Napue. The court therefore could presumably have disclosed to Napue the precise nature of most of the government's charges and allowed Napue some opportunity to respond without revealing the witnesses' identities.

The second troubling aspect of the *ex parte* communications is that the govern-

---

**9.** The *in camera* narrative included the following allegations: (1) Napue was arrested on September 15, 1965, and charged with the murder of an informant (though the charges were later dismissed); (2) Police informant Annie Rash believed that Napue had her beaten up on two occasions and was responsible for the 1977 firebombing of her apartment, which injured her and killed her roommates (Napue was the subject of a police investigation into the firebombing); (3) Charles Wilson believed Napue murdered Wilson's brother, Rabbit Parker, to prevent him from cooperating with the police, and Wilson therefore feared for the safety of his family if Napue knew he was going to testify for the government; (4) Hilman Stamps believed that he and his brother were set up by Napue to

be arrested and that his family would be in danger if he were identified as a government witness; (5) Charles Wilson's girlfriend had been followed and confronted in an intimidating manner which she believed was tied to the fact that Wilson was providing information to the police about Napue; (6) Edward Fields was threatened once directly by Napue and once by someone he believed was sent by Napue in connection with Fields' cooperation with the police; and (7) Napue was involved with the purchase of numerous guns through his wife and other women, many of which were recovered by the police, and several of the government's witnesses feared Napue because he was always armed.

ment did not in any way attempt to document its allegations to the court. For example, the government attributed to various witnesses and other individuals statements that they feared Napue and descriptions of violent behavior by Napue, but the government did not provide the court with affidavits from any of these individuals to support these representations. Also, in its *in camera* narrative, the government discussed information obtained from police records and grand jury testimony, but did not provide the court with copies of those records or testimony. The government's failure to substantiate its allegations is particularly disturbing given Napue's lack of opportunity for rebuttal. The court thus had before it only the unsupported and untested claims of the government, hardly an unbiased party in a criminal prosecution. The government's *ex parte* representations therefore lacked a good deal in reliability, a deficiency that should be considered when weighing them against Napue's discovery needs.

Also highly relevant to our review of the district court's actions is the place of these *ex parte* communications in the court's overall handling of discovery matters. The

court was keenly, and properly, aware of Napue's need for adequate information to prepare his defense. It continually monitored the information being provided to Napue and expressed its concern about the adequacy of this information throughout the pretrial proceedings and the trial itself.[10] At Napue's request, the court postponed the start of the trial from January 1985 to March 1985. The initial trial date of January 1985, rather than the proposed November 1984, was also set at Napue's request. The court repeatedly slowed the pace of the trial to allow Napue adequate time to prepare.[11] For example, when Napue expressed a need for additional time, the court granted Napue short recesses and allowed his cross-examinations of government witnesses to be spread over several days. The court directed the government to begin its case with those witnesses whose identities and discovery materials had been revealed to Napue for the longest time. What was expected to be a three-week trial lasted eleven weeks. At one point, the court stated that the trial was proceeding "[t]wice as slow as any other trial I have ever had." Tr. Mar. 29, 1985, at 357.

10. For example, the court stated:
Certainly in most cases, almost all cases, the Court has the discretion to require the government to supply a list of witnesses prior to trial. It may be just prior to trial or well in advance of trial, depending on all sorts of circumstances.
But that really is a discretionary call. There isn't really anything in the rules that requires the government to give the names of witnesses. What it is required to give is what is stated under Rule 16. Certainly in terms of what Congress says, I can't even require them to give 3500 material until after the person testifies if they insist that that is the way it be.
My problem here has been trying to, given the nature of the case, given the length of time, of the charges, and given the somewhat sprawling nature of it, to get to the defense considerably more specificity than is in the indictment itself in order to facilitate the preparation of the defense. Because of the nature of the case, the government has resisted giving a complete list of witnesses well in advance, although it has certainly identified finally a fair number of them. I am, in the circumstances, not going to compel them to do it like it is an income tax case or some nurse who didn't declare her earnings.
. . . .

But what I am prepared to do is structure the thing as we go along so that as we get from point A to point B to point C, that you are going to be fed stuff enough in advance so that you can do the job that you have to do, which is defend your client.
Tr. Mar. 13, 1985, at 34–35.

11. The court stated:
Yes, but as I was saying the last time and the time before, particularly the last time, as we go through this, number one, the government has got to provide certain information relative to what's coming up. If at that time we need at that to slow things down so you can digest it, we are going to slow things down. If, when we get to putting in a defense, if we have got to slow things down there because, just by the pressure of the trial—and I certainly understand that once you are on trial, it is a flat-out, totally demanding kind of strain on everybody—that if at that point you're in a position of saying I am just not in a position to pull all the stuff together because of everything else that has been going on, and I need a couple days to get this stuff organized, you are not going to have any big quarrel with me.
Tr. Mar. 5, 1985, at 32–33.

■ We need not, however, make a definitive finding about whether the district court abused its discretion in this case. Napue has failed to demonstrate that the court's use of the *ex parte* proceedings caused him any prejudice. The government provided Napue prior to trial with considerable information about what it intended to show at trial, including the identities of most of its witnesses, and by the seventh day of the eleven-week trial Napue had been given the names of all of the government's witnesses. Moreover, as discussed, the court went to considerable lengths to compensate for any refusal of information to Napue prior to trial and to accommodate Napue's need for time to prepare his defense.

Perhaps more important, Napue has made no showing that, if he had been afforded an opportunity to respond to the government's *ex parte* communications, he would have been successful in obtaining more extensive discovery earlier. In its *in camera* narrative and *ex parte* hearing, the government outlined numerous specific violent acts and threats with which Napue seemed to have been involved. The government described the sources of its allegations and the available supporting evidence. The government also related fears of Napue that had been expressed by some of its witnesses. The government was concerned both that Napue presented an actual threat to the safety of its witnesses and that its witnesses would be deterred from testifying out of fear of Napue. Napue contends that he did not commit the acts of violence attributed to him and that he was

not a threat to the safety of the government's witnesses. Yet Napue has not explained on appeal how he could have established this before the district court. We cannot expect Napue to disprove the government's *ex parte* allegations based on record evidence since the *ex parte* nature of these allegations prevented Napue from building a record on these matters. However, nothing has prevented Napue during this appeal from describing how, if given the opportunity, he would have refuted those allegations that appear to be readily rebuttable. While Napue has protested in general terms the district court's acceptance of the concerns about dangerousness, he has neither denied, nor described how he would have refuted, these allegations. Napue, in fact, concedes that he was arrested on September 15, 1965, and charged with the murder of a government informant. (Though these charges were later dropped, the government submitted an affidavit from a Drug Enforcement Agency officer who had reviewed the file and concluded that there was "substantial evidence" that Napue committed the murder.) Napue also fails to contest the government's claim that he was involved in the purchase of numerous guns (several of which were recovered directly from Napue) after an earlier felony conviction which made it illegal for him to possess firearms.[12] Moreover, Napue has not claimed that the government acted in bad faith or negligently in making its *ex parte* representations. Napue thus has not demonstrated to us that, if given the opportunity, he might have persuaded the district court that the government's concerns were unfounded.[13]

12. In one notable exception, Napue points out that, contrary to the *in camera* narrative, government witness Charles Wilson testified at trial that he never believed that Napue murdered Wilson's brother, Rabbit Parker. Although this testimony seems inconsistent with the suspicions and fears attributed to Wilson in the government's *in camera* narrative, Wilson did not testify at trial about what he had told the government prior to trial. Also, if Wilson did fear Napue as the government alleged, he might be hesitant to accuse Napue of murder in an open courtroom with Napue present. In any event, this one possible inconsistency among the many specific allegations by the government would have detracted little, if at all, from the government's showing of Napue's dangerousness and the fears of its witnesses.

13. In his petition for rehearing, Napue claims that the district judge found the *ex parte* allegations to be unsupported when he declined to rely on those allegations as a basis for detaining Napue during the period between verdict and sentencing. The judge states: "There isn't a lot there in terms of a possible danger to specific people or the community as of 1985." Tr. June 4, 1985, at 29. This statement, however, appears in the midst of the judge's explanation of his decision to detain Napue on other grounds—the danger to the community posed by Napue's established tendency to deal in drugs. *Id.* at 22–33. Moreover, on at least two earlier occasions the judge indicated that specific evidence confirmed that witnesses had reason to fear Napue. *See* Tr. Mar. 19, 1985, at 253 (reviewing evidence of Napue's weapons violations); Tr. May 24, 1985, at 136–38 (reviewing file of Drug Enforcement Agency on 1965 murder of government informant).

### III.

Napue next argues that reversal is required because the prosecutor referred in her rebuttal argument to convictions that were obtained in previous drug trafficking and police corruption cases as a result of testimony in those cases by two of the government's witnesses here, Ed Fields and Charles Wilson. The district court ruled during Napue's trial that the government's witnesses could testify as to the indictments their prior cooperation with the government had produced. The court barred, however, any discussion of the final outcome of those prosecutions: "It doesn't seem to me the conviction[s] would have anything to do with [this case].... I don't think we need to get into convictions." Tr. Apr. 11, 1985, at 915–16.

Notwithstanding this ruling by the court, the prosecutor made the following statements during her rebuttal argument:

Mr. Durkin [Napue's trial counsel] makes an interesting argument. Ed Fields, he says, as a result of his testimony and cooperation in the Valdes case was responsible for 19 people pleading guilty, but he is not to be believed in this courtroom.

Charles Wilson, although Mr. Durkin suggests he lied at the Marquette 10 and, therefore, he is lying here, was responsible also for the conviction of people, which Mr. Durkin made very clear in terms of his cross-examination about the police officers in the Marquette 10 case.

Tr. May 29, 1985, at 480–81. The court sustained Napue's trial counsel's objection to those remarks and gave a curative instruction to the jury. The court denied Napue's motion for a mistrial.

 The government argues that the prosecutor's comments were proper because they were invited by Napue's trial counsel, who, according to the government, was the first to violate the court's order by eliciting testimony from the government witnesses regarding the outcome of their earlier cooperation with the government. Putting aside for a moment the question of Napue's counsel's conduct, we believe that the government's argument that the prosecutor's comments were proper because Napue's counsel "opened the door" for them misconceives the nature of the "opening the door" or "invited error" doctrine. That doctrine does not condone a prosecutor's improper argument by adopting the proposition that two wrongs make a right. It merely recognizes that the prosecutor's misconduct may be less damaging to the defendant when balanced against the defense counsel's excesses. *United States v. Mazzone*, 782 F.2d 757, 762–63 (7th Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 141, 93 L.Ed.2d 84 (1986); *see also United States v. Young*, 470 U.S. 1, 11, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985). The government cites no authority that suggests that improper questioning on the part of defense counsel justifies the government in ignoring an order of the court, nor are we aware of any such authority. Rather, if defense counsel exceeds proper bounds in eliciting evidence, the prosecutor can object and can even ask that defense counsel be held in contempt; the prosecutor may not, however, fight fire with fire. *See Mazzone*, 782 F.2d at 762–63. The government's failure to object to Napue's counsel's improper questioning might be viewed as a tactic on its part to have the door opened to its own objectionable argument. *See* 1 J. Weinstein, *Weinstein's Evidence* ¶ 103[2], at 16 (1986).

 But the question before us is not merely whether the prosecutor's statements were improper, but whether these improper statements prejudiced Napue's right to a fair trial. Considered in the context of the entire trial, *see United States v. Buchbinder*, 796 F.2d 910, 919 (7th Cir.1986), we cannot hold that the prosecutor's statements had this kind of impact. Napue's counsel raised the subject of the convictions himself on at least two occasions during the trial, once during his opening argument while he was discussing witness Edward Fields, and once during his cross-examination of witness Charles Wilson. In addition, there was repeated testimony throughout the trial to the effect that Fields and Wilson had cooperated with the government in other prosecutions. Under these circumstances, it seems unlikely that the jury learned anything from the prosecutor's rebuttal comments that it had not already gleaned during the eleven weeks of trial. Further, in light of the substantial evidence of Napue's guilt presented at trial, *see supra* pp. 1314–15, we are convinced that the prosecutor's brief remarks at issue here did not affect the jury's verdict.

Moreover, the trial court issued a curative instruction immediately after the pros-

ecutor's comments, cautioning the jury that "[w]hat happened in another case is irrelevant to the credibility of the witnesses." Tr. May 29, 1985, at 481. We cannot, of course, know with certainty what effect this curative instruction had upon the jury, but the presumption in our system is that such instructions are taken seriously.[14] See Mazzone, 782 F.2d at 764. Accordingly, we hold that the prosecutor's rebuttal comments did not prejudice Napue's right to a fair trial.

IV.

On August 1, 1978, the Chicago police arrested Napue at a Holiday Inn in Chicago. The police searched his room and found two guns, a scale, heroin and cocaine. After a hearing on Napue's motion to suppress, the district court granted the motion as to the narcotics but denied it as to the guns and the scale. Napue argues on appeal that the court also should have excluded the guns and the scale. We think there is a sound basis for agreement with Napue. We find, however, that even if the admission into evidence of the guns and the scale was erroneous, the error was harmless.

At the suppression hearing, the district court heard conflicting testimony about how the arrest took place. Daniel Centracchio, the arresting officer in charge of the operation, testified that, prior to arresting Napue, he had instructed one of his officers to obtain a warrant. For some reason not disclosed in the record, the warrant was never obtained. Napue does not dispute, however, that the police had probable cause to arrest him. Centracchio testified that when he arrested Napue, Napue had just stepped out of his hotel room and the door to his room was still open. Centracchio testified that he brought Napue back into the room, saw a scale, advised Napue of his rights and then searched the room. He could not recall where the guns or the narcotics were found. He stated that he

also saw a woman in the room, later identified as Cynthia Thompson, but he did not testify about whether he knew or suspected anyone was in the room prior to entering it.

Wayne Lipsey, another arresting officer, stated that he could not remember if the door to Napue's hotel room was open or closed when the arrest was made. He recalled entering and searching the room, but he did not remember finding a scale, guns or narcotics, or seeing a woman in the room. Lipsey testified that, prior to entering the room, "I had no idea anybody else would be in there." Tr. Aug. 13, 1984, at 262.

Napue testified that when he left his room he closed the door and that he was arrested in the hall fifteen to twenty feet from the closed door. Following his arrest, according to Napue, the police officers began banging and kicking on the door to his room, shouting "open the door or we'll kick it down." Id. at 270. Cynthia Thompson, who was in the room, opened the door and they pushed their way in without her consent. Napue stated that the scale was under the bed and was not visible until the box spring and mattress were removed.

Cynthia Thompson testified that she opened the door when the police officers were threatening, and attempting, to break it down. She stated that she could not remember what the police found in the room.

The district court did not believe Centracchio's testimony about where the arrest took place. The court found that Napue was arrested in the hall and that the door to his room was closed, as Napue had testified.[15] The court nevertheless found that, although the police officers did not have a right to search the room, they did have a right to enter the room and secure it. The court, citing Segura v. United States, 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984), justified the entry as follows:

> ... It is highly unlikely that somebody in those circumstances would leave the door open....
>
> ....
>
> ... I am making a finding that the testimony that they could see through, look through the door and see things and that the arrest took place inside the room wasn't credible. Tr. Apr. 9, 1985, at 717, 719.

14. If this were a close case, a curative instruction might not have been adequate to ensure that the prosecutor's remarks did not prejudice the jury's consideration of the case. See Mazzone, 782 F.2d at 764. As noted above, however, this was not a close case.

15. The court stated:
I believe that [the arrest] did happen out in the hall someplace. ... I don't think that Mr. Napue left the door open and [the police] appeared inside and saw all sorts of things.

[O]nce they arrested him, they had a right to find out who else was there too, so that things wouldn't disappear in the interim, that whether they kicked open the door or knocked on the door, in any event they immediately knew, and I think they probably did knock on the door, maybe with the firm expectation of kicking it in if somebody didn't open it. But they within moments knew that Cynthia Thompson was in the room, and at that point, whether she opened the door or they went into the room without her opening the door, they had a right to go in to secure the room.

. . . .

A Segarra [sic] type . . . .

Tr. Apr. 9, 1985, at 718. The court found that the scale and the guns were in plain view once the officers entered the room and therefore were admissible, but that the narcotics were the inadmissible products of an unlawful search.

The district court and the government do not have a sound basis for reliance on *Segura*, 468 U.S. 796, 104 S.Ct. 3380.[16] In *Segura*, government agents entered an apartment without a search warrant in order to "secure" the apartment until a warrant could be obtained. Upon their initial warrantless entry, the agents conducted a limited security check during which they noticed narcotics paraphernalia in plain view. After the warrant arrived, the agents performed a full search that produced further narcotics contraband. The Supreme Court stated that it would not address the admissibility of the evidence obtained during the initial "limited security check": "The Court of Appeals affirmed the District Court's holding that there were no exigent circumstances to justify the warrantless entry into petitioners' apartment. That issue is not before us, and we have no reason to question the courts' holding that that *search* was illegal." 468 U.S. at 798, 104 S.Ct. at 3382 (emphasis in original). Rather, the issue before the Court in *Segura* was the admissibility of the evidence obtained pursuant to the valid search warrant. Thus, *Segura* is inapposite to the facts of this case. The evidence in question here was not obtained pursuant to a valid search warrant as in *Segura*. Rath-

er, the evidence was a product of a search similar to the warrantless entry and limited security check that the lower courts in *Segura* had held illegal and the Supreme Court did not address. *Segura* therefore cannot authorize the warrantless entry in this case. We therefore consider whether exigent circumstances justified the entry, though we need not resolve this issue because we conclude that any error committed in admitting the scale and guns was harmless.

■ The Fourth Amendment protects individuals from unreasonable searches and seizures. A guest in a hotel room enjoys the same constitutional protection against unreasonable searches and seizures as does a tenant of a house. *Stoner v. California*, 376 U.S. 483, 490, 84 S.Ct. 889, 893, 11 L.Ed.2d 856 (1964). "[A] search or seizure carried out on a suspect's premises without a warrant is *per se* unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions based on the presence of 'exigent circumstances.'" *Coolidge v. New Hampshire*, 403 U.S. 443, 474–75, 91 S.Ct. 2022, 2042–43, 29 L.Ed.2d 564 (1971). The government bears the burden of establishing the existence of exigent circumstances. *Vale v. Louisiana*, 399 U.S. 30, 34, 90 S.Ct. 1969, 1971, 26 L.Ed.2d 409 (1970).

■ Exigent circumstances exist where the police have an objective and reasonable fear that evidence is about to be destroyed. *United States v. Rivera*, 825 F.2d 152, 156 (7th Cir.1987). This court has recently described the applicable standard as follows: "In determining whether the agents reasonably feared imminent destruction of the evidence, the appropriate inquiry is whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced agent to believe that evidence might be destroyed before a warrant could be secured." *Id.*

The Supreme Court has cautioned that an arrest outside the arrestee's house cannot "provide its own 'exigent circumstance' so as to justify a warrantless search of the arrestee's house." *Vale v. Louisiana*, 399 U.S. at 35, 90 S.Ct. at 1972. The arresting officers must have a reasonable belief that

---

**16.** The government in its brief on appeal seriously misconstrues the holding in *Segura*. The government incorrectly attributes to the Court, and mischaracterizes as a "holding" of the Court, parts of section IV of Chief Justice Burger's opinion. That section, however, was joined only by Justice O'Connor. *See* Government's Brief at 50.

there are people within the premises who are destroying or are about to destroy evidence. Direct evidence of an imminent destruction of evidence may obviously support an entry based on exigent circumstances. In addition, the Second Circuit has stated that arresting officers may not make a warrantless entry into premises following an arrest outside the premises to conduct a security check to prevent the destruction of evidence unless the following conditions are met:

> [T]he arresting officers must have (1) a reasonable belief that third persons are inside, and (2) a reasonable belief that the third persons are aware of the arrest outside the premises so that they might destroy evidence, escape or jeopardize the safety of the officers or the public.

*United States v. Agapito,* 620 F.2d 324, 336 n. 18 (2d Cir.), *cert. denied,* 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980); *see also United States v. Segura,* 663 F.2d 411, 414–15 (2d Cir.1981), *aff'd,* 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984).

In *Agapito,* the court found that the entry was unlawful because the above conditions were not met: (1) "At no time did the agents hear or see anyone in the room other than [the arrestees]," and (2) "even if the agents here thought that accomplices remained in the room, there was no reason for them to believe that the accomplices knew of the arrests so that they might destroy evidence or somehow 'attack' the agents." 620 F.2d at 336. Similarly, the Second Circuit in *Segura* found an entry to be unlawful where the arrest took place outside the premises in question and the police "had no reasonable belief that anyone was in the apartment," or "that anyone [who might have been] in the apartment knew of [the] arrest." 663 F.2d at 415. This court, in *Rivera,* found that exigent circumstances justified a warrantless entry into an arrestees' hotel room where the agents reasonably believed that the room

was the central locus of large drug transactions, that it was occupied by the arrestees' co-conspirator (because they saw a "Do Not Disturb" sign on the door and heard television or radio sounds from within), and that the co-conspirator was "ready to destroy the evidence if his or her compatriots did not return as planned." 825 F.2d at 156.

In the present case, the district court did not find that the arresting officers suspected someone was in the hotel room before they began entering it. Rather, the court stated "I am not sure that they knew she was in the room...." Tr. Apr. 9, 1985, at 718. It is, of course, possible that the officers suspected, or had reason to suspect, that the room was occupied, but the government did not offer evidence at the suppression hearing to support such a suspicion. The district court also did not make a clear factual finding on the important point of whether the officers were trying to break down the door to the hotel room when they gained entry. The court stated, "I think they probably did knock on the door, maybe with the firm expectation of kicking it in if somebody didn't open it." *Id.* Officer Centracchio did not comment on this point, and Officer Lipsey testified that prior to entering the room, "I had no idea anybody else would be in there." Tr. Aug. 13, 1984, at 262. Even if the police officers had reason to suspect that someone was in the room, the district court did not find, and the government did not offer any evidence, that the officers had a reasonable basis for believing that anyone in the room would have known of Napue's arrest in the hall on the other side of the closed door and therefore might have destroyed evidence. There was no testimony, for example, that commotion created during the arrest was likely to have alerted anyone in the room to the fact that an arrest had taken place.[17]

---

17. There are difficulties in saying that exigent circumstances arose when the police officers discovered that Thompson was in the room after they began banging on the door to gain entry. First, the record does not establish that the officers decided to enter the room only after

they discovered Thompson was in the room out of fear that she would destroy evidence; rather, the record indicates that the officers may have been attempting to break the door down when Thompson responded and that the officers may have intended to enter the room whether or not

Given that both the district court's factual findings and the government's evidence on this issue are extremely sparse, we are unable to find that the government met its burden of proving the existence of exigent circumstances. If we were not convinced, as we are, that the admission into evidence of the scale and the guns did not affect the outcome of the trial, we would consider either reversing the district court's conclusion that the entry was lawful or remanding this issue to the district court for further fact-finding.

■ Even if the entry into the room had been lawful, the guns should have been suppressed as were the narcotics. The record contains no support for the district court's finding that the guns were in plain view. Officer Centracchio testified that he could not recall where the guns or the narcotics were found, though he did testify that the scale was in plain view. Officer Lipsey could not even recall finding guns in the room. When the district court ruled on Napue's motion to suppress, the court found that the scale was in plain view and admissible, but the narcotics were discovered only after the unlawful search, and thus were inadmissible. The prosecutor

then questioned the judge about the guns, asking, "[w]hat about the guns on the table, on the night table?" Tr. Apr. 9, 1985, at 717. The court responded, "On that one I think they could get those." *Id.* The government, however, had not introduced any evidence that the guns were found in plain view on the night table. The district court could not accept as sufficient merely the prosecutor's statement on this point (although the defendant did not object to the prosecutor's comment).[18]

■ Although the district court apparently erred in admitting into evidence the guns, and possibly the scale, the court's error was harmless. In deciding whether or not a constitutional error was harmless, the Supreme Court has said: " 'The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.' " *Chapman v. California,* 386 U.S. 18, 23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967) (quoting *Fahy v. Connecticut,* 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963)). The burden is on the government here to prove beyond a reasonable doubt that the admission of the guns and scale did not contribute to the verdict obtained.

---

anyone responded to their banging and kicking. Second, even when Thompson did respond and the officers knew the room was occupied, the record does not indicate that she knew that Napue had been arrested or that she did anything to cause the officers to fear that she would destroy evidence. In fact, the officers apparently did not attempt to observe Thompson's response, or give her time to respond, before they rushed into the room. Finally, if exigent circumstances did exist after the officers ascertained someone was in the room, such exigency was arguably of the officers' own making and, if so, cannot support a warrantless entry. The Second Circuit in *Segura* faced similar facts and found that a warrantless search was not justified:

The government nonetheless attempts to bring the agents' actions within the second *Agapito* prerequisite by arguing that their knock at the door of 3D, along with the preceding commotion as they forcibly brought Segura to the apartment, alerted the inhabitants of the apartment to Segura's arrest and made it likely that they would destroy whatever evidence was there. Such exigency as inhered in these conditions, however, was of the agents' own making. They had no need to

drag Segura to his apartment or to knock at the door. We will not expand the exception made for emergency security checks by permitting the agents to "create their own exigencies ... and then 'secure' the premises on the theory that the occupants would otherwise destroy evidence." *United States v. Allard,* 634 F.2d 1182, 1187 (9th Cir.1980); *United States v. Rosselli,* 506 F.2d 627, 630 (7th Cir. 1974) (agents' knocking at door, creating emergency, did not exempt them from warrant requirement: "when the emergency justification is advanced, we believe it is appropriate to appraise the agents' conduct during the entire period after they had a right to obtain a warrant and not merely from the moment when they knocked at the front door.") 663 F.2d at 415.

18. Because the record does not indicate where in the room the guns were found, we cannot accept the government's argument that the guns were properly seized during a "protective sweep" of the room. We cannot simply assume that the guns were found in the area "within [Napue's] immediate control," as required in *Chimel v. California,* 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969), and its progeny.

*Id.* 386 U.S. at 24, 87 S.Ct. at 828. The Court has noted, however, that "it is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations." *United States v. Lane,* 474 U.S. 438, 445, 106 S.Ct. 725, 730, 88 L.Ed.2d 814 (1986) (quoting *United States v. Hasting,* 461 U.S. 499, 509, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96 (1983)). The Court further recognized that "given the myriad safeguards provided to assure a fair trial, and taking into account the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and ... the Constitution does not guarantee such a trial." *Id.* (quoting *Hasting,* 461 U.S. at 508–09, 103 S.Ct. at 1980).

We feel certain that the two guns and scale did not contribute to the jury's decision to convict Napue of the narcotics charges. The jury did not learn anything new from this evidence. In addition to introducing these two guns, the government introduced testimony and records connecting Napue to over thirty guns. The jury also had already heard testimony that Napue had a scale in his hotel room. Two hotel employees testified that they saw a scale there. Most important, the evidence presented at trial of Napue's involvement with the sale and purchase of narcotics was overwhelming. Many government witnesses testified that they bought or sold large quantities of cocaine or heroin in transactions with Napue; many others offered corroborating testimony. Our initial description of the government's case, *see supra* pp. 1314–1315, includes brief summaries of the testimony of fewer than ten of the over forty-five government witnesses. After a review of the record, we are confident beyond a reasonable doubt that the district court's apparent error here was harmless.

### V.

■ Napue next claims that the district court erred in denying him an evidentiary hearing on his claim that the government initiated this prosecution in retaliation for his refusal to cooperate fully in its "Mar-

quette 10" investigation of police corruption in Chicago. The parties agree that the standard for granting an evidentiary hearing on a defendant's motion to dismiss his indictment as a vindictive prosecution is an issue of first impression. This circuit has held that in order to obtain an evidentiary hearing on a selective prosecution claim (which Napue argues is analogous to a vindictive prosecution claim), a defendant must make "a *prima facie* case based on facts 'sufficient to raise a reasonable doubt about the prosecutor's purpose.'" *United States v. Jarrett,* 705 F.2d 198, 204 (7th Cir.1983), *cert. denied,* 465 U.S. 1004, 104 S.Ct. 995, 79 L.Ed.2d 228 (1984) (quoting *United States v. Falk,* 479 F.2d 616, 620–21 (7th Cir.1973) (en banc)), *quoted in United States v. Kerley,* 787 F.2d 1147, 1148 (7th Cir.1986); *see also United States v. Swiatek,* 819 F.2d 721, 725 (7th Cir.1987) ("A trial court need only grant an evidentiary hearing on the issue of outrageous government conduct when the defendant has presented specific facts that are sufficient to raise a significant doubt about the propriety of the government's actions."). We find that this is also the appropriate standard in the context of a vindictive prosecution claim, but that Napue has not presented sufficient evidence to raise a reasonable doubt as to the propriety of the government's actions. Napue therefore was not entitled to an evidentiary hearing.

■ A prosecution is vindictive and a due process violation if it is undertaken "[t]o punish a person because he has done what the law plainly allows him to do." *United States v. Goodwin,* 457 U.S. 368, 372, 102 S.Ct. 2485, 2488, 73 L.Ed.2d 74 (1982). The government may not penalize an individual for exercising a protected statutory or constitutional right. *Id.* We assume without deciding that Napue's alleged refusal to cooperate in the Marquette 10 investigation involves the exercise of a right for which Napue may not be penalized by this prosecution. We must therefore decide whether Napue has raised a reasonable doubt that the government brought this prosecution in retaliation for his failure to cooperate.

**1330**

Napue's claim is based on the filing of the indictment against him; the typical vindictive prosecution claim is based on the enhancement of charges in response to a defendant's exercise of a legal right, most often a procedural right in connection with the defendant's prosecution. We acknowledge that under some circumstances the mere filing of an indictment might form the basis for such a claim. Nevertheless, the Supreme Court in *United States v. Goodwin*, 457 U.S. 368, 102 S.Ct. 2485, discussed extensively the important differences between vindictive prosecution in the pretrial context and such claims based on decisions made by prosecutors during the trial or after the conclusion of the trial. The Court concluded that vindictive prosecution claims are less likely to be successful, and a presumption of vindictiveness is unwarranted, in a pretrial setting. *Id.* at 380–85, 102 S.Ct. at 2492–95.[19] The Court emphasized that the prosecutor must be allowed broad discretion in selecting the charges against the accused. *Id.* at 380–81 & n. 11, 102 S.Ct. at 2492 & n. 11. "A prosecutor should remain free before trial to exercise the broad discretion entrusted to him to determine the extent of the societal interest in prosecution." *Id.* at 382, 102 S.Ct. at 2493. He or she needs broad discretion in the timing of the indictment and its contents, both of which depend on changing factors such as when information becomes available to the prosecutor, how the prosecutor views the evidence, and how and when the prosecutor's theory of the case evolves.

In the course of preparing a case for trial, the prosecutor may uncover additional information that suggests a basis for further prosecution or he simply may come to realize that information possessed by the State has a broader significance. At this stage of the proceedings, the prosecutor's assessment of the proper extent of prosecution may not have crystallized.

*Id.* at 381, 102 S.Ct. at 2492. Because once a prosecutor has begun a trial, he or she is much more likely to have gathered and assessed all of the relevant information and made a determination about the appropriate charges, "a change in the charging decision made after an initial trial is completed is much more likely to be improperly motivated than is a pretrial decision." *Id.*[20]

With this in mind we turn to the evidence that Napue offers in support of his claim of vindictiveness. We agree with Napue that, "[t]he extent to which the government had obtained its evidence prior to the defendant's assertion of some right 'is one of the key indicia scrutinized by courts when confronted with a claim of vindictive prosecution.'" Napue's Brief at 64 (quoting *United States v. Robison*, 644 F.2d 1270, 1272–73 (9th Cir.1981)). Napue claims that the government obtained much of its evidence against him prior to his interview concerning the Marquette 10 investigation which occurred on June 10, 1982. The government strenuously disputes this, however, and argues that it obtained most of its evidence about Napue's involvement with illegal drugs well after Napue's Marquette 10 interview. In support of its argument, the government outlined in its brief the dates on which it obtained its principal evidence against Na-

---

**19.** The Court noted, however, that "we of course do not foreclose the possibility that a defendant in an appropriate case might prove objectively that the prosecutor's charging decision was motivated by a desire to punish him for doing something that the law plainly allowed him to do." 457 U.S. at 384, 102 S.Ct. at 2494.

**20.** The Court gave a second reason why a presumption of vindictiveness is inappropriate for a pretrial decision:

In addition, a defendant before trial is expected to invoke procedural rights that inevitably impose some "burden" on the prosecu-tor. Defense counsel routinely file pretrial motions to suppress evidence; to challenge the sufficiency and form of an indictment; to plead an affirmative defense; to request psychiatric services; to obtain access to government files; to be tried by jury. It is unrealistic to assume that a prosecutor's probable response to such motions is to seek to penalize and to deter. The invocation of procedural rights is an integral part of the adversary process in which our criminal justice system operates.

457 U.S. at 381, 102 S.Ct. at 2493.

pue. Government's Brief at 3–5, 42–43.[21] In addition, the prosecutors described to the district court how and when their case against Napue developed. In denying Napue's motion for an evidentiary hearing, the district court stated, "[w]ell, let me back up first by saying that I do accept and agree with [the prosecutor's] historical overview as to the progress of the investigations, the successive grand juries, and when the pieces fell into place." Tr. June 20, 1985, at 23. We therefore find that the timing of the government's obtaining evidence against Napue does not support Napue's vindictive prosecution claim.[22]

Napue offers other evidence that he claims supports a finding of vindictiveness. For example, a government document prepared on October 23, 1983, as part of the investigation of Napue that led to this prosecution states that "Napue is a long-time dope trafficker who has thwarted prosecution through a combination of wiliness and corruption of police officers" and "it is apparent that Napue also benefited from the police corruption." Defendant's Motion to Dismiss the Indictment for Governmental Misconduct, and Request for an Evidentiary Hearing, Exhibit A. Napue claims these statements demonstrate that the government believed that Napue was not cooperating satisfactorily. The statements seem to us to indicate only that the government viewed Napue as someone who should be prosecuted for his illegal activity. Napue also points to instances where the government allegedly sought an order to compel an individual to testify before the grand jury and subpoenas of five individu-

als to testify during trial even though these six individuals denied any knowledge of Napue's drug dealing. Again, this conduct by the government—assuming its truth—seems to reflect the government's desire to indict and ultimately convict Napue, and not an impermissible vindictive motivation.[23] Throughout his argument on this claim, Napue appears to equate the government's determination to obtain an indictment and conviction with vindictive motivation. The Supreme Court has cautioned against accepting such an argument, stating:

> The imposition of punishment is the very purpose of virtually all criminal proceedings. The presence of a punitive motivation, therefore, does not provide an adequate basis for distinguishing governmental action that is fully justified as a legitimate response to perceived criminal conduct from governmental action that is an impermissible response to noncriminal, protected activity.

*Goodwin,* 457 U.S. at 372–73, 102 S.Ct. at 2488. Because the evidence offered by Napue does not raise a reasonable doubt that the government was improperly motivated by vindictiveness in filing an indictment against Napue, we affirm the district court's finding that Napue was not entitled to an evidentiary hearing on this claim.[24]

## VI.

Count II of the indictment charged Napue with participating from the spring of 1974 to October 1982 in a single continuous conspiracy to possess cocaine and heroin

**21.** The government also explained why it did not prosecute Napue for the May 10, 1974 sale, arranged by Armando Martinez, of one ounce of cocaine to an undercover agent. Martinez had begun to cooperate with the government in a number of drug cases and the government did not want to reveal his identity as an informant.

**22.** Napue also offers as evidence of vindictiveness the government's failure to bring to the sentencing judge's attention all of the government's evidence of Napue's alleged narcotics activities when the judge was sentencing Napue for being a felon in possession of a firearm. This sentencing hearing took place in December 1981, six months before the Marquette 10 interview.

**23.** The remaining evidence offered by Napue fails to support an inference of vindictiveness for this same reason.

**24.** In denying Napue's request for an evidentiary hearing, the district court noted that most of the relevant matters were thoroughly aired during the course of the trial so that an evidentiary hearing was not necessary. Tr. June 20, 1985, at 22–26. Because we find that Napue was not entitled to a hearing, we need not consider whether, if Napue had been entitled to a hearing, the opportunity afforded him during the trial to explore his vindictive prosecution claim would have been an adequate substitute.

with the intent to distribute these substances. Napue argues on appeal that the evidence at trial demonstrated only that Napue participated in isolated transactions or, at most, in multiple conspiracies, rather than the single continuous scheme depicted in the indictment.

■ A conspiracy requires an agreement among the co-conspirators to commit an unlawful act, often a difficult element to prove because a conspiracy's essential characteristics are secrecy and concealment. *See Blumenthal v. United States*, 332 U.S. 539, 557, 68 S.Ct. 248, 256, 92 L.Ed. 154 (1947). Yet it is the nature and scope of the agreement that is the determinative factor in distinguishing between single and multiple conspiracies. *United States v. Towers*, 775 F.2d 184, 189 (7th Cir.1985); *United States v. Percival*, 756 F.2d 600, 607 (7th Cir.1985); *United States v. Varelli*, 407 F.2d 735, 742 (7th Cir.1969). Recognizing the difficulty of requiring proof of something that by definition resists substantiation, this court has held that direct evidence of the agreement is not required and that the agreement can be inferred from the circumstances. *Percival*, 756 F.2d at 607. Separate conspiracies exist when each of the conspirators' agreements has its own end, and each transaction constitutes an end in itself. *See Blumenthal*, 332 U.S. at 558–59, 68 S.Ct. at 257; *Kotteakos v. United States*, 328 U.S. 750, 754–55, 66 S.Ct. 1239, 1242–43, 90 L.Ed. 1557 (1946); *Varelli*, 407 F.2d at 742–43. If, on the other hand, the agreements between the conspirators represent stages or different functions to be performed in the formulation of a larger scheme, the object of which is to effectuate a single unlawful result, then there is a single conspiracy:

> While the parties to the agreement must know of each other's existence, they need not know each other's identity nor need there be direct contact. The agreement may continue for a long period of time and include the performance of many transactions. New parties may join the agreement at any time while others may terminate their relationship. The parties are not always identical, but this does not mean there are separate conspiracies.

*Varelli*, 407 F.2d at 742 (citation omitted).

■ Applying these principles to the facts here, the evidence plainly manifests the existence of one ongoing conspiracy to distribute cocaine and heroin during the years 1976 through 1982. Six acknowledged drug traffickers testified at trial regarding their purchases from or sales to Napue of large amounts of cocaine and heroin, at least during this period. The evidence showed that many of Napue's co-conspirators knew each other personally, and that they assisted and relied upon one another. *See Percival*, 756 F.2d at 607–08. For example, Charles William, a heroin dealer, testified not only as to his own regular and prolonged dealings with Napue, but also as to his and Napue's involvement with two other heroin dealers, Rabbit Parker and Dog Cannon. Robert Gaston testified that he and Parker jointly bought cocaine and heroin from Napue. The witnesses' testimony verified (though verification seems unnecessary, given the large quantities of narcotics involved in most of Napue's transactions) that no single deal represented an end in itself, but each was part of a broader agreement between Napue and his confederates to coordinate in different ways and at different times the distribution of drugs. *See id.; United States v. Spudic*, 795 F.2d 1334, 1337 (7th Cir.1986).

More problematic is the question whether Napue's 1974 activity was related to the conspiracy that existed by 1976, or whether it was the fruit of a separate conspiracy to possess and distribute narcotics.[25] The government's view is that the evidence describes a single conspiracy. Napue served as the conspiracy's chief executive. He recruited a succession of female confederates, beginning with his wife in 1974, to help him run his enterprise. He coordinated the actual purchase and sale of narcotics

---

25. Napue argues (though not at any length) that the May 10, 1974 cocaine sale did not even constitute a separate conspiracy. We find this argument to be meritless.

with a number of different individuals over the life of the conspiracy. Though the personnel may have fluctuated, the goal of the conspiracy did not.

Although we do not necessarily reject the government's characterization, we are troubled by the lapse of some two and a half years between the May 1974 sale and the sale to Wilson in the latter part of 1976. The relationship among Napue, Martinez and Torres terminated following the May 1974 sale. The only one of the 1974 conspirators who seems still to have been associated with Napue in 1976 is his wife, who apparently was buying guns for him from 1974 through 1976. Evidence of a time gap, or the existence of periods in which a defendant was not actively conspiring in the conspiracy, is not necessarily fatal to a theory of a single, continuous conspiracy. *United States v. Abraham,* 541 F.2d 1234, 1237 (7th Cir.1976), *cert. denied,* 429 U.S. 1102, 97 S.Ct. 1128, 51 L.Ed.2d 552 (1977). Nonetheless, when the period is as long as the one here, we think the government should consider carefully how it will characterize its case in an indictment. The government cannot weave a unitary scheme from episodes that are "so far apart and so differently peopled as to destroy any semblance of relationship." *United States v. Goss,* 329 F.2d 180, 183 (4th Cir.1964).

We need not definitively resolve the "one conspiracy or two" question in this case, however, because Napue has failed to demonstrate, as he must, that any variance between the indictment and the proof had a substantial and injurious effect on the case's outcome. *See United States v. Lane,* 474 U.S. 438, 444–45, 106 S.Ct. 725, 729–30, 88 L.Ed.2d 814 (1986); *United States v. Bruun,* 809 F.2d 397, 406 (7th Cir.1987). Even if there were two conspiracies, the evidence demonstrated that Napue was at the "hub" of both conspiracies. When this situation is presented, it is usually not necessary to explore the ways in which the plan might be recast as a

series of more limited agreements. *Bruun,* 809 F.2d at 406–07; *United States v. Wozniak,* 781 F.2d 95, 98 (7th Cir.1985); *United States v. Noble,* 754 F.2d 1324, 1330 (7th Cir.1985). A variance between the number of conspiracies charged and the number proved can be very prejudicial in cases in which multiple conspirators are tried together. In such a situation, "[t]he dangers of transference of guilt from one [defendant] to another across the line separating conspiracies" are present. *Kotteakos,* 328 U.S. at 774, 66 S.Ct. at 1252, *quoted in Noble,* 754 F.2d at 1330. However, that is not this case. An answer to the "one conspiracy or many" question may also be pertinent to the admissibility of evidence under the co-conspirators hearsay rule or to punishment. *Wozniak,* 781 F.2d at 97. Neither of these concerns is implicated here.[26] Napue's strongest allegation of prejudice is that the testimony of the DEA officer who participated in the May 1974 sale lent support to the accounts of the witnesses who testified regarding Napue's later activity. But the DEA officer was only one of three witnesses who testified concerning the May 1974 sale, and only one of dozens who testified for the government throughout the trial. In light of the overwhelming evidence against him, we find Napue's contention that the DEA agent's testimony substantially influenced the jury's verdict unpersuasive. Accordingly, even if there were two conspiracies, any error created by a variance between the indictment and the proof was harmless.

### VII.

For the above reasons, we affirm Napue's conviction.

AFFIRMED

---

**26.** We do not suggest that a variance between the number of conspiracies charged and proved will never prejudice a defendant situated at the

hub of all the conspiracies. We would, however, expect instances of actual prejudice to such a defendant to be rare.