**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Aurelio Carrasco LECHUGA and Samuel Lechuga, Defendants–Appellants.**

**Nos. 90–1656, 90–1689.**

United States Court of Appeals, Seventh Circuit.

Argued Dec. 4, 1990.

Decided Feb. 22, 1991.

Mary Harkenrider, Michael R. Pace, Barry R. Elden, Asst. U.S. Atty., Criminal Receiving, Appellate Div., Chicago, Ill., for U.S.

Thomas A. Moore, Lydon & Griffin, Ken D. Valle, Chicago, Ill., for Aurelio C. Lechuga.

Sam Adam, John R. DeLeon, Daniel Radakovich, Thomas A. Moore, Lydon & Griffin, Chicago, Ill., for Samuel Lechuga.

Before POSNER and FLAUM, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

FLAUM, Circuit Judge.

Defendants Samuel Lechuga and Aurelio Carrasco Lechuga were convicted of one count of conspiring to possess cocaine with intent to distribute and one count of possessing cocaine with intent to distribute. They appeal their convictions, alleging that the vehicle stop that led to the discovery of evidence introduced by the government at trial was a violation of their Fourth Amendment right to be free from unreasonable searches and seizures. They also challenge the constitutionality of subsequent searches of the vehicle in which they were driving and an apartment. We conclude that the stop and all subsequent searches were constitutionally permissible and affirm the convictions.

## I. FACTS AND PRIOR PROCEEDINGS

For the past seven years, Chicago police officer Guadalupe Rodriguez has been detailed to the Drug Enforcement Administration, for whom he has conducted many narcotics-related investigations. In the course of those investigations he has utilized on no fewer than ten occasions a confidential informant who has proven himself to be highly reliable. On September 12, 1989 this informant contacted Officer Rodriguez with information that Samuel Lechuga ("Lechuga") had received a sizeable quantity of cocaine and was in the process of distributing it in the Chicago area. The informant also told Rodriguez that Lechuga would be making a major cocaine delivery on September 15, 1989.

On the strength of this information, Rodriguez and another Chicago police officer, Tom Ptacek, conducted surveillance outside Lechuga's Blue Island, Illinois home on the 15th. Late that afternoon, the two officers saw Lechuga leave his house and drive away. He proceeded to several locations in Blue Island and spoke to several people before returning home. His last stop was a local supermarket parking lot where he met with defendant Aurelio Carrasco Lechuga ("Carrasco"), who had also driven to the parking lot. Lechuga returned to his home, only to leave again a few minutes later to walk to a nearby restaurant where he made a phone call at a pay telephone. Once again Lechuga returned home, and once again he left a few minutes later when Carrasco drove up to Lechuga's house. After a brief conversation, Lechuga entered Carrasco's car, and the two men drove off. Officers Rodriguez and Ptacek followed in separate cars.

Lechuga and Carrasco stopped outside an apartment building in Alsip, Illinois. Officer Rodriguez parked in a lot outside the apartment building, saw both men enter, and saw a light go on in a second-floor window. Minutes later, both men left the building, each carrying small brown paper bags. Carrasco handed his bag to Lechu-

ga, reached for his keys, and opened the trunk of his car. Lechuga put both packages inside a plastic bag which he placed deep in the trunk. Carrasco and Lechuga entered the car and drove off, followed by Officers Rodriguez and Ptacek.

According to Officer Rodriguez, after Carrasco left the lot outside the apartment building, he began to drive erratically, slowing down to approximately ten miles per hour, then resuming a normal speed of thirty-five miles per hour before slowing down again, all in a six-block stretch of street. Rodriguez, believing that his surveillance had been detected, instructed Ptacek to stop Carrasco's car. Ptacek drove in front of Carrasco's car while Rodriguez approached it from behind, sandwiching the vehicle. After all three cars had come to a stop, Rodriguez left his car and approached the driver's side of Carrasco's vehicle. Ptacek approached the passenger side, where Lechuga was seated. It was dark when the two officers approached the car, and Rodriguez held his gun in his hands.

Officer Rodriguez asked Carrasco to leave his car and began to speak with him in Spanish. He asked Carrasco who owned the car he was driving in and Carrasco responded that it was his. He then asked Carrasco if there was anything in the trunk of the car. Carrasco responded that there was nothing in the trunk. Rodriguez asked if he could look for himself and Carrasco said yes, handing Rodriguez the keys. Rodriguez opened the trunk and retrieved the plastic bag from behind the spare tire well. He removed the paper bags from inside the plastic bag and, when he looked inside them, saw smaller plastic bags containing a white powdery substance. Rodriguez field-tested the substance and determined that it contained cocaine, at which point he placed Lechuga and Carrasco under arrest and read them their rights.

After Lechuga and Carrasco were placed under arrest, Officer Ptacek asked Lechuga if there was any more cocaine in the apartment the defendants had visited prior to the vehicle stop. Lechuga said that there was no more cocaine. Ptacek asked if he could take a look for himself. Lechuga said that he could, and executed a consent form worded in Spanish. Ptacek then asked Lechuga for his keys to the apartment, which Lechuga surrendered. By this point Rodriguez and Ptacek had been joined by other police officers. They left the defendants with these officers and proceeded to the apartment building. Using Lechuga's keys they entered the apartment, which was completely unfurnished. There was no food in the refrigerator or the cupboards. There was, however, an unlocked suitcase in a closet, and in that suitcase was a brown plastic bag containing more white powder and a precision electronic scale.

The bags found in the trunk of Carrasco's car proved to contain 974.7 grams of a mixture containing cocaine. The bag in the suitcase contained 1,768.2 grams of a mixture containing cocaine. Based on this evidence, a grand jury indicted Lechuga and Carrasco of one count of conspiracy to possess with intent to distribute cocaine and one count of possession with intent to distribute cocaine. Both defendants moved to suppress the cocaine and the scale. The district court denied the motion to suppress, and, after a one day bench trial, found both defendants guilty on both counts. Each was sentenced to 78 months in prison followed by five years of probation.

## II. THE VEHICLE STOP

In their appeal, Carrasco and Lechuga[1] challenge the constitutionality of the investigatory stop of Carrasco's vehicle. They first contend that the stop in this case was not supported by facts that would lead a police officer "reasonably to conclude in light of his experience that criminal activity may be afoot." *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968). Next they argue that their detention by police transcended the brief and limited "stop and frisk" encounter that the

---

1. Only Lechuga filed a brief in this appeal. Carrasco successfully moved to adopt Lechuga's brief. Attorneys for both defendants spoke at oral argument.

**1038**

Supreme Court held in *Terry* was allowable under the Fourth Amendment, and instead became a seizure requiring probable cause rather than the reasonable suspicion needed to support an investigatory stop. They assert that the district court erred in ruling that the stop did not violate their Fourth Amendment rights and in refusing their motion to suppress the cocaine found in the car trunk and the apartment as fruits of the allegedly unconstitutional search.

### A. Presence of Reasonable Suspicion

Numerous cases have addressed the question of whether and under what circumstances a tip from a reliable informant coupled with corroboration can provide a police officer with knowledge of "specific and articulable facts which, taken together with reasonable inferences drawn from those facts," *Terry*, 392 U.S. at 21, 88 S.Ct. at 1880, provide a basis for the limited intrusion on individual liberty that an investigatory stop represents. In *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), a police officer learned from an individual known to him to be a reliable informant that Williams was carrying a weapon. Without seeking further corroboration, the police officer approached the car where Williams was seated and asked him to leave his vehicle. Williams responded instead by rolling down his window. At this point the police officer saw Williams' gun and reached in and grabbed it. The Supreme Court upheld this investigatory stop and frisk of Williams. 407 U.S. at 147–48, 92 S.Ct. at 1923–24. More recently, in *Alabama v. White*, — U.S. ——, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990), the Supreme Court discussed the relationship between the degree of reliability of the informant and the degree of corroboration necessary to justify an investigatory stop based on the information he or she supplies. Writing for the Court, Justice White observed that "if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable." 110 S.Ct. at 2416.

We examined the use of a tip from a reliable informant as the basis for an investigatory stop in *United States v. Ocampo*, 890 F.2d 1363 (7th Cir.1989). In that case an informant who in the past had proven trustworthy informed police that defendant Luis Escobar was expecting a shipment of cocaine and might store that shipment at a building in Chicago. Police began surveillance at that location. They observed a car drive up to the building and two individuals, one carrying an opaque plastic bag, enter the building after one of them conducted what appeared to be counter-surveillance. They then left the apartment and, after again surveying the landscape, drove off. Two police officers stopped the car to " 'interview' " its occupants. We concluded that the stop was supported by reasonable suspicion and did not violate the defendants' Fourth Amendment rights. *Id.* at 1370.

In this case, as in *Ocampo*, the informant who supplied the initial tip identifying Lechuga as a cocaine dealer had proven himself to be reliable. Indeed, as Officer Rodriguez testified at the suppression hearing, he had supplied accurate information on no fewer than ten occasions over the preceding eight to nine years. As in *Ocampo*, Officer Rodriguez did not rely on the tip alone but watched the defendants long enough to observe behavior tending to corroborate the tip. Lechuga's frequent trips away from his home, his meeting with Carrasco in a parking lot located a few blocks from Lechuga's home, his foray to a pay phone also located near his house, the brief stop Carrasco and Lechuga made at the apartment, the fact that they left the apartment carrying small parcels which they elected to store in the trunk of their cars rather than in the passenger compartment, and Carrasco's unusual driving, all indicated that the informant's tip that Lechuga dealt drugs and was planning a delivery was accurate.

It is true that none of these activities, taken by itself, suggested that either Lechuga or Carrasco was involved in criminal activity. However, as the Supreme Court recognized in examining whether the police

had probable cause to support an investigatory stop in *Reid v. Georgia*, 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980) "there could, of course, be circumstances in which wholly lawful conduct might justify the suspicion that criminal activity was afoot." *See also United States v. Colonia*, 870 F.2d 1319, 1323 (7th Cir.1989) ("The relevant inquiry is not whether specific conduct is innocent or guilty, but the level of suspicion attaching to particular kinds of noncriminal acts."). In weighing the significance of the facts known to Officer Rodriguez when he ordered the stop of Carrasco's car we look to "'the totality of the circumstances.'" *United States v. Sokolow*, 490 U.S. 1, 8, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (quoting *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)); *see Ocampo*, 890 F.2d at 1368; *Colonia*, 870 F.2d at 1323. The significance of this series of innocent acts may not be apparent to the layman, but "[a] pattern of behavior interpreted by the untrained observer as innocent may justify a valid investigatory stop when viewed collectively by experienced drug enforcement agents" like Officer Rodriguez. *United States v. Ceballos*, 719 F.Supp. 119, 123 (E.D.N.Y.1989); *see also Ocampo*, 890 F.2d at 1369 ("'circumstances before [the officer] are not to be dissected and viewed singly; rather, they must be considered as a whole.'") (quoting *United States v. Hall*, 525 F.2d 857, 859 (D.C.Cir.1976)); *Colonia*, 870 F.2d at 1323.

In this case, the pattern of activity Officer Rodriguez observed warranted at least a reasonable suspicion that crime was afoot. Lechuga's meeting with Carrasco in a parking lot near his house suggested that the two men were discussing something they wished to shield from probing eyes and ears. Lechuga's subsequent trip from his house to a nearby pay telephone to place a call bolstered this characterization of his actions. The suspicion that the two men were involved in a furtive endeavor was heightened by Lechuga's access to an apartment located not far from his home, from which he and Carrasco emerged holding two small parcels. This behavior gave the impression that Lechuga maintained the apartment as a place to store drugs, a common practice among narcotics distributors. That Lechuga placed the parcels he retrieved from the apartment deep in the trunk of Carrasco's car rather than keeping them in the passenger compartment where they would have been more readily accessible did nothing to allay the officers' suspicions that they contained drugs. Finally, Carrasco's driving suggested counter-surveillance, a fact we have found to support an investigatory stop in numerous prior cases. *See, e.g., United States v. Pace*, 898 F.2d 1218, 1229 (7th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 3286, 111 L.Ed.2d 795 (1990); *United States v. Jaramillo*, 891 F.2d 620, 627 (7th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1791, 108 L.Ed.2d 792 (1990); *Ocampo*, 890 F.2d at 1368. Taken together, the facts observed by Officer Rodriguez, especially when viewed in light of the prior tip he had received from a trusted informant, amply suffice to establish reasonable suspicion for the stop of Carrasco's car.

### B. Degree of Intrusion

Lechuga and Carrasco mount a second challenge to the stop, arguing that even if the police interception of Carrasco's car was supported by reasonable suspicion, the police conduct in this case went beyond the brief investigatory stop *Terry* allows, becoming an arrest requiring probable cause.

Past cases examining the issue of when a vehicle stop and subsequent questioning crosses the dim and wavering boundary that distinguishes *Terry* stops from arrests, *see United States v. Serna–Barreto*, 842 F.2d 965, 967 (7th Cir.1988), wisely shun the task of announcing "a bright-line test to determine when, given the 'endless variations in facts and circumstances,' police-citizen encounters exceed the bounds of mere investigative stops." *Ocampo*, 890 F.2d at 1368–69 (quoting *Florida v. Royer*, 460 U.S. 491, 506–07, 103 S.Ct. 1319, 1329, 75 L.Ed.2d 229 (1983)). Rather, the cases establish that when "the degree of intrusion into the suspect's personal security [is] reasonably related in

scope to the circumstances at hand," *Ocampo,* 890 F.2d at 1363, a motorist can be subjected to a broad range of undeniably intrusive police conduct based on no more than a police officer's reasonable suspicion that he is engaged in crime. Milestones along the path to this expansive view of the measures law enforcement officers may in appropriate circumstances take without transforming *Terry* stops into arrests include the numerous cases allowing the use of drawn weapons during these encounters, *see, e.g., United States v. Jackson,* 918 F.2d 236, 238 (1st Cir.1990); *United States v. Lane,* 909 F.2d 895, 899 (6th Cir.1990); *United States v. Del Vizo,* 918 F.2d 821, 824 (9th Cir.1990); *Serna–Barreto, supra,* 842 F.2d at 968; *United States v. Jones,* 759 F.2d 633, 638 (8th Cir.), *cert. denied,* 474 U.S. 837, 106 S.Ct. 113, 88 L.Ed.2d 92 (1985), cases allowing the police to block the suspect's vehicle in order to effectuate the stop, *see, e.g., Jackson, supra,* 918 F.2d at 238; *United States v. Taylor,* 857 F.2d 210, 213 (4th Cir.1988); *United States v. Quinn,* 815 F.2d 153, 156–57 (1st Cir.1987); *United States v. Hardnett,* 804 F.2d 353, 357 (6th Cir.1986), *cert. denied,* 479 U.S. 1097, 107 S.Ct. 1318, 94 L.Ed.2d 171 (1987); *Jones, supra,* 759 F.2d at 637, cases allowing the police to order a suspect to lie down on the ground, *see, e.g., United States v. Buffington,* 815 F.2d 1292, 1301 (9th Cir.1987), to handcuff the suspect, *see, e.g., United States v. Crittendon,* 883 F.2d 326, 329 (4th Cir.1989); *United States v. Hastamorir,* 881 F.2d 1551, 1557 (11th Cir.1989); *United States v. Glenna,* 878 F.2d 967, 972 (7th Cir.1989), or to detain him for extended periods while the police check for outstanding warrants, *see United States v. Lego,* 855 F.2d 542, 545 (8th Cir.1988).

One important circumstance to be considered is whether the show of force by police exceeded that reasonably necessary for their protection, a criterion which balances "the need for law enforcement officers to protect themselves ... in situations where they may lack probable cause for arrest," *Terry,* 392 U.S. at 20, 88 S.Ct. at

1879, with the severe intrusion that a motorist feels when he is pulled over and approached by police with their weapons in full view or even pointed at him. Where the suspect is thought to be armed, or even when he is thought to be involved in criminal activity in which the use of weapons is a commonplace, police may protect themselves by displaying their weapons. Allowing police ready access to their weapons in these circumstances is an unfortunate but necessary accommodation between the interests protected by the Fourth Amendment and the fact that "[i]nvestigative detentions involving suspects in vehicles are fraught with danger to police officers." *Michigan v. Long,* 463 U.S. 1032, 1047, 103 S.Ct. 3469, 3480, 77 L.Ed.2d 1201 (1983). Other factors "which bear on the issue of reasonableness" are whether the stop was no longer than necessary to "confirm or dispel" the officer's suspicions, *United States v. Sharpe,* 470 U.S. 675, 686, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985), "the location of the stop, the time of day and the reaction of the suspect to the approach of police...." *Ocampo,* 890 F.2d at 1369.

With these circumstances in mind, we turn to the question of whether the stop of Carrasco's vehicle was so intrusive that it became an arrest requiring probable cause. In *Serna–Barreto* we noted that "a pointed gun ... makes the encounter far more frightening than if the officer's gun remains holstered, or even drawn but pointed down at his side...." 842 F.2d at 967, but upheld the use of a weapon pointed at the suspect where the stop occurs at night, where the stop is supported by more than an uncorroborated tip from an informant, where the tip relates to narcotics offenses or other criminal activity that frequently involves the threat of violence, and where the approaching officer does not have a full view of the suspect because she was seated in a vehicle as he approached. 842 F.2d at 967–68. Here, despite the presence of all these factors, Officer Rodriguez chose the less intimidating alternative of drawing his gun but keeping it pointed to the street.[2]

**2.** We note that there is a factual dispute as to whether Officer Rodriguez pointed his gun at

We cannot say that this was unreasonably intrusive.

 The reaction of the suspects to the knowledge that they were being watched by police serves to justify the sandwiching of Carrasco's vehicle between the two unmarked police cars. As soon as he suspected that the police were observing his movements, Carrasco began counter-surveillance. This raised the concern that he might seek to evade a vehicle stop by escaping at high speed. The use of two police cars to effect the vehicle stop in this case, while certainly intrusive, was a reasonable response to the risk a chase would pose to the police and unwary motorists or pedestrians, not to mention the defendants themselves. As to the length of the stop, Officer Rodriguez wasted no time in establishing that Carrasco wanted to protect what Rodriguez had seen him put in the trunk of his car enough to deny its existence to an inquiring police officer. The vehicle stop in this case did "not involve any delay unnecessary to the legitimate investigation of the law enforcement officers." *United States v. Sharpe*, 470 U.S. 675, 687, 105 S.Ct. 1568, 1576, 84 L.Ed.2d 605 (1985); *see Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983) (plurality opinion).

We conclude that the investigatory vehicle stop and Officer Rodriguez's brief questioning of defendant Carrasco did not become an arrest requiring probable cause. Because Officers Rodriguez and Ptacek had a reasonable suspicion based on articulable facts that the defendants were engaged in criminal activity, all that is necessary to support an investigatory stop, the detention of Carrasco's vehicle for the purpose of asking him about the contents of his car trunk did not violate defendants' rights under the Fourth Amendment and did not mandate the suppression of subsequently seized evidence.

## III. THE SUBSEQUENT SEARCHES

After detaining Carrasco's vehicle and briefly questioning him, Officer Rodriguez obtained Carrasco's oral consent to search the trunk of his car, where he found the cocaine that formed the basis for the arrest of Carrasco and Lechuga. Officer Ptacek later obtained Lechuga's written consent to search the apartment Carrasco and Lechuga had visited shortly before the vehicle stop, where they discovered more cocaine and a scale. On appeal, Carrasco and Lechuga contend that even if the initial investigatory stop was permissible under the Fourth Amendment, the subsequent searches of the car trunk and the apartment were unconstitutional because the consent procured from Carrasco to search the trunk and from Lechuga to search the apartment were not given voluntarily.

"[O]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973). The consent to search must be voluntary, *id.* at 222, 93 S.Ct. at 2045, and voluntariness "is a question of fact, to be determined from the totality of all the circumstances." *Id.* at 227, 93 S.Ct. at 2048; *Colonia, supra*, 870 F.2d at 1324. The government bears the burden of proving that a defendant's consent to search was voluntary, *id.* at 1324, but it is not required to prove that the person consenting to the search was aware that she had the right to refuse her consent. *Schneckloth*, 412 U.S. at 222–23, 93 S.Ct. at 2045–46.

 The circumstances of Officer Rodriguez's encounter with Carrasco that led to Rodriguez's search of the car trunk indicate that Carrasco voluntarily consented to the search.[3] The conversation between

---

Carrasco or pointed it toward the ground. The district judge resolved this dispute in favor of the government and, as we have previously observed in examining a dispute concerning facts found in a suppression hearing, "in a swearing contest, the trial judge's ... choice of whom to believe is conclusive in the appellate court un-

less the judge credits *exceedingly* improbable testimony." *United States v. Cardona–Rivera*, 904 F.2d 1149, 1152 (7th Cir.1990).

3. Lechuga has no standing to object to the search of Carrasco's car. *See Rakas v. Illinois*, 439 U.S. 128, 148, 99 S.Ct. 421, 432, 58 L.Ed.2d

Rodriguez and Carrasco was brief, and there is no evidence that Rodriguez used unusual influence to coerce Carrasco into allowing him to peer into the car trunk. It is true that Rodriguez was armed, but there is no evidence that he menaced Carrasco with his gun in order to persuade him to allow the search of the trunk. *See United States v. Jackson,* 901 F.2d 83, 84 (7th Cir.1990) (fact that police were armed at the time consent was given does not negate the possibility that consent was voluntary). Nor can Carrasco allege that he consented without appreciating the meaning of his act. Rodriguez spoke to Carrasco in Spanish, a language both men understood. The conversation led Carrasco not only to consent to the search of his trunk but to give Rodriguez his keys. This suggests that Carrasco, having been stopped by police who seemed to have been following his car for long enough to witness an unusual pattern of activity, "may have thought that, whether or not he consented, the jig was up; if that is what he thought, it did not make his consent involuntary." *Jackson,* 901 F.2d at 84.

■ Turning to the search of the apartment, Lechuga makes two arguments: first that his consent to the search was not voluntary, and second, that even if he did consent, his consent did not extend to the suitcase in the closet where Officers Rodriguez and Ptacek found cocaine and a scale.[4] As to the issue of the voluntariness of Lechuga's consent, the proof of his consent is stronger than Carrasco's, because unlike Carrasco, Lechuga consented in writing. As with the questions to Carrasco, the consent form Lechuga signed was worded in Spanish, a language Lechuga undeniably understood. There is no evidence that Officer Ptacek used unusual influence to exact Lechuga's permission for the apartment search. And, as with Carrasco, the facts suggest that after brief questioning Lechuga surrendered his keys to Ptacek.

■ Turning to the scope of the consent Lechuga gave Officer Ptacek, we have recognized that "the scope of a consent search is limited by the breadth of the actual consent." *United States v. Garcia,* 897 F.2d 1413, 1419 (7th Cir.1990). However, in this case the scope of the consent Lechuga gave on the form he completed was unlimited. Moreover, while we have held that under some circumstances consent to search a room does not extend to closed containers within that room, *United States v. Rodriguez,* 888 F.2d 519, 523 (7th Cir.1989), that case is readily distinguishable. There the question was the apparent authority of a wife to consent to a search of closed boxes that, as might have been obvious to the police officers conducting the search, she had no authority to allow the officers to open. The boxes in that case were located in a different room on a different floor than the one Mrs. Rodriguez lived in, and while she possessed a key to this room, she indicated at the time of the search that she was unsure that she could let the police enter. *See* 888 F.2d at 522–23.

In this case Lechuga had apparent authority over the whole apartment, including the closet where the suitcase containing the cocaine and the scale was located. The apartment was completely unfurnished, a fact Lechuga was surely aware of at the time he gave his consent. This fact might have led him to limit his consent by forbidding the police from doing what they had just done a few feet away, namely open one container (a car trunk), and find another (a paper bag), then open that one and look inside. Lechuga could have suspected that the sparse decor of the apartment would focus police attention on the suitcase and that Rodriguez and Ptacek might be as thorough in searching the apartment as they were in searching the trunk, that they

387 (1978); *United States v. Duprey,* 895 F.2d 303, 309–10 (7th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1927, 109 L.Ed.2d 291 (1990).

**4.** Though the issue of Lechuga's standing to challenge the apartment search is clouded by Lechuga's subsequent denial that the apartment was his, we proceed on the assumption that he had some possessory interest in the apartment sufficient to confer Fourth Amendment standing to challenge the search.

would, in other words, open one container (a closet), find another (a suitcase), then open that one. Knowing this, he may well have concluded that there was little sense in postponing the inevitable by limiting his consent in a way that would inevitably focus the attention of the police on those parts he had verbally cordoned off.

## IV. CONCLUSION

For the foregoing reasons, the convictions of both defendants on all counts are AFFIRMED.