UNITED STATES of America, Plaintiff,

v.

Antoine COLE, Defendant.

No. 2:00–CR–48–RL.

United States District Court,
N.D. Indiana,
Hammond Division.

July 21, 2000.

AUSA Doug Petrovic, U.S. Attorneys Office, Dyer, IN, for Plaintiff.

Mark A. Psimos (Psimos and Psimos), Merrillville, IN, for Defendant.

### *ORDER*

LOZANO, District Judge.

This matter is before the Court on the Motion to Suppress Evidence, filed by Defendant, Antoine Cole, on May 3, 2000. For the reasons set forth below, this motion is **GRANTED**. The Court **ORDERS** that all evidence seized from inside the 1124 Jennings Street residence at the time of and subsequent to Cole's arrest, in addition to all evidence obtained as a result of the illegal search and seizure, be **SUPPRESSED**.

*BACKGROUND*

The Defendant, Antoine Cole, has been charged in a three-count indictment with distributing crack cocaine, possessing with the intent to distribute crack cocaine, and possession of a firearm in furtherance of a drug trafficking crime. Cole has moved to suppress all items seized from inside the 1124

Jennings Street residence at the time of and subsequent to his arrest, in addition to all fruit of the search and seizure in question. After the Government filed a brief in response to this motion, the Court held an evidentiary hearing on this matter on May 31, 2000. At the conclusion of the hearing, the Court took the motion under advisement and ordered the parties to file further briefs on the issue, which the parties have now done. After having considered the credibility of the witnesses, the Court makes the following findings of fact.

*FINDINGS OF FACT*

Shortly before noon on April 23, 2000, members of the Gary Police Department were patrolling near 1124 Jennings Street in Gary. Corporal Jeff Trevino was in uniform in an unmarked vehicle. Sargent Willie Upshaw was in uniform in another unmarked vehicle. Officers Darlene Brightenstein and Frank Carillo were both in uniform in a third, marked vehicle. The officers observed a male individual exit the back door of the residence at 1124 Jennings and walk across the residence's yard. As the individual exited the residence, the officers observed the individual's right hand balled up with a white piece of paper in it. When the individual observed the marked police car, he placed his right hand in his pocket.

The officers found this activity suspicious because there had been reports of drug-related activity in the area. In addition, during the previous week, Trevino had seen some but not a heavy traffic of people exiting the back door of 1124 Jennings. Trevino's actions in watching 1124 Jennings at that time were not taken as part of an official stakeout of the residence.

Upon seeing the aforementioned individual exit 1124 Jennings on April 23 and place his right hand in his pocket, Brightenstein and Carillo exited their vehicle and stopped him. The officers asked him to take his hand out of his pocket, and when he did, Brightenstein saw something drop to the ground. Carillo picked the item up, revealing a substance later determined to be crack cocaine. By this time, Trevino had arrived, and he asked the individual his name, from where he had just come, and who he knew in the 1124 Jennings residence. The individual stated that he had not come from 1124 Jennings but from across the street and was simply cutting across the yard of 1124 Jennings. The individual then handed the officers an identification card identifying him as Evar Whiteside. This individual, now known to be Evar Whiteside, was placed under arrest and handcuffed.

Trevino, knowing that Whiteside had lied when he stated he had not just come from 1124 Jennings, walked to the back door of the 1124 Jennings residence to determine if he could identify who lived there and if anyone inside could verify that Whiteside had just left there. While Trevino approached the back door, Brightenstein and Carillo stayed with Whiteside at the police car until Upshaw arrived, at which point Brightenstein approached the back door of the residence.

When Trevino reached the back door of 1124 Jennings, the glass door was shut and the inside door was fully open. Through the glass door, Trevino could see a few stairs leading into a basement area. He could also see an individual standing at the bottom of the basement stairs about twelve feet from the back door and talking on the telephone. Trevino could also see what appeared to be a handgun, some baggies, and some crack cocaine in the basement near the individual.

Trevino knocked on the glass door to get the individual's attention, and after a few seconds, the individual in the basement looked up. Trevino motioned him to come outside. The individual came outside and immediately shut the glass door behind him.

With both Trevino and the individual now standing outside the back door, Trevino asked him if he lived at 1124 Jennings. The individual stated that he did live there and that it was his mother's home. Trevino then asked if the individual knew the man under arrest near the street (and now known to the police to be Evar Whiteside). The individual looked over at Whiteside and stated that he did not know him. Trevino asked the individual if the man under arrest near the street had exited the 1124 Jennings residence, and the individual stated that that

man (Whiteside) had not exited the 1124 Jennings residence. Trevino then asked the individual at the back door what his own name was, and the individual stated his own name was Evar Whiteside.

Trevino confronted the individual at the back door, who had just identified himself as Evar Whiteside, with the identification card of the man under arrest near the street being Evar Whiteside. The individual at the back door then admitted that his own name was not Evar Whiteside but instead was Antoine Cole. Cole then admitted that the man under arrest near the street was his cousin, Evar Whiteside, and that Whiteside had just left 1124 Jennings prior to his arrest near the street.

Trevino then either asked or told Cole that he needed to see some identification. Cole stated that his identification was downstairs in the basement in his wallet, and that the glass door locked when he shut it behind him. Trevino then stated that the police needed to see his identification to verify who he was because he was lying to the police. Trevino then asked Cole if the front door was unlocked, and Trevino answered that he didn't think so. Trevino asked Brightenstein, who had reached the back door some time just prior to or during Trevino's questioning of Cole, to stay with Cole at the back door. Trevino also signaled to Brightenstein the police code for the presence of a gun, but never indicated to Cole that he saw what he believed to be a gun or drugs in the basement. Trevino stated that he was going to check the front door to see if it was unlocked. Cole did not state that Trevino could not check the front door or that Trevino needed a search warrant to check the front door.

While Trevino believed at the time he went to check the front door that he could have arrested and handcuffed Cole for false informing, Cole was neither arrested nor handcuffed. Instead, Cole remained uncuffed and at the back door with Brightenstein while Trevino checked the front door.

After determining that the front door was unlocked, Trevino decided it would be safer for him to proceed through the house alone and unlock the back door than to go back around to the back door, retrieve Cole, and then lead Cole through the front door and into the basement for the purpose of retrieving Cole's identification. Trevino then entered the house for the purpose of unlocking the back door so that Cole's identification could be retrieved. At the point he entered the house, Trevino believed that, if his intention had been to retrieve the gun or drugs in the basement, there was no reason he could not have obtained a search warrant, which could be obtained in an hour or less.

When he entered the front door, Trevino had his weapon drawn, for once he entered the house he then feared that someone might be in the house and that there might be more guns in the house. In proceeding through the house to the back door, Trevino gazed around to see if anyone was in the house. Trevino took less than ten seconds to enter the front door and proceed through the house to the back door. By the time he reached the back door, Trevino had satisfied himself that no one was in the house. In addition to gazing around, Trevino believed that someone might have called out if they were in the house.

When Trevino reached the back door, he unlocked the glass door. He then told Cole that the door was now unlocked and that he wanted Cole to get his identification. Cole then followed or was led by Trevino into the house. Brightenstein followed behind Cole and Upshaw followed behind Brightenstein. As Trevino proceeded down the first step into the basement, Cole turned and started to go upstairs away from the basement. Trevino grabbed Cole, stopped him, and stated, "You said your ID was downstairs. Why are you going upstairs?" Trevino heard Cole say something in response, but could not recall the exact nature of this response.

The four then proceeded downstairs, with Trevino in the lead, Cole behind him, Brightenstein behind Cole, and Upshaw behind Brightenstein. At this time, Trevino had no reason to believe someone was downstairs, but went downstairs first because it was not impossible that someone could be downstairs. Brightenstein did not have her weapon drawn as they went downstairs; she felt confident that Trevino would secure whatev-

er danger she believed could conceivably be downstairs. Cole was not handcuffed as they went downstairs. No backup had been called to the scene.

As he approached the bottom of the stairs, Trevino clearly saw the gun in the basement. Upon seeing the gun, Cole was immediately handcuffed and the gun secured. The drugs and baggies were also in plain view in the basement. After handcuffing Cole, the officers immediately started looking for Cole's identification, which was found in his wallet on the entertainment center in the basement. Trevino stated that he thought it was pretty messed up that Cole was selling drugs out of his mother's home. Cole responded that he did not sell out of his mother's home but only packaged the drugs there and sold them elsewhere. Cole was then asked if he would consent to a search of the house, and he responded that the police could not search it without a search warrant. The police conducted no further search of the house at this time.

## CONCLUSIONS OF LAW

### Consent to Search

■ The Government's first theory for justifying the warrantless intrusion into the basement, which lead to seizure of the gun and drugs, is that Cole consented to the police entering and searching for his identification. Since physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed, it is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable. *See, e.g., Welsh v. Wisconsin,* 466 U.S. 740, 748–49, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984). However, it is "well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search conducted pursuant to consent to search." *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). In *Schneckloth,* the Supreme Court stated that "the question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances," with the presence or absence of any single factor not controlling the determination. *Id.* at 227, 93 S.Ct. 2041; *United States v. LaGrone,* 43 F.3d 332, 333 (7th Cir.1994). The "totality of the circumstances" includes an analysis of the defendant's age, education, and apparent intelligence; whether the defendant was advised of his right to refuse consent; the presence of physical or subtle coercion; the defendant's belief that no incriminating evidence would be found; and the extent and level of the defendant's cooperation with the police. *United States v. Jenkins,* 46 F.3d 447, 451 (5th Cir.1995); *United States v. Kozinski,* 16 F.3d 795, 810 (7th Cir.1994); *United States v. Rojas,* 783 F.2d 105, 109 (7th Cir.1986). The Government bears the burden of proving, by a preponderance of the evidence, that the consent was voluntary. *United States v. Lechuga,* 925 F.2d 1035, 1041 (7th Cir.1991).

■ In this case, the Government contends that Trevino asked for and received Cole's consent to enter the house for the purpose of unlocking the back door, in addition to asking for and receiving Cole's consent to enter the basement for the purpose of obtaining Cole's identification. The Government must prove consent is "unequivocal and specific," and such consent must be proven by the Government with "clear and positive testimony." *See, e.g., United States v. Worley,* 193 F.3d 380, 387 (6th Cir.1999); *United States v. Price,* 925 F.2d 1268, 1270 (10th Cir.1991); *United States v. Shaibu,* 920 F.2d 1423, 1426 (9th Cir.1990). Furthermore, a court must "carefully examine the government's claim that a defendant consented." *Worley,* 193 F.3d at 386. Indeed, existence of consent to search is not to be lightly inferred. *Shaibu,* 920 F.2d at 1425 (9th Cir. 1990).

■ Accordingly, the Court begins by closely analyzing the testimony at the evidentiary hearing. The Court finds, based on this testimony, that the Government has not proven with clear and positive testimony that Cole was ever *asked* if the police could enter the basement to search for his identification, as opposed to simply being *told* that the police needed to see his identification. In reviewing the tape of the evidentiary hear-

ing,[1] the Court finds that Trevino testified that, in his initial dialogue with Cole, "I asked him, I told him I needed some identification." Thus, it is unclear as to whether Trevino *asked* if he could see Cole's identification or if he *told* Cole that he needed to see his identification. According to Trevino's testimony, Cole then responded that his identification was in the house but that it could not be retrieved because the door had locked behind him. The Court does not find Cole's statement to be a specific and unequivocal statement that the police could enter the house (either alone or with Cole) to search for and retrieve the identification. *See, e.g., United States v. Zertuche–Tobias*, 953 F.Supp. 803, 827 (S.D.Tex.1996) (statement of location of an object does not in itself indicate consent for police to search object beyond scope of their otherwise lawful authority); *see also Worley*, 193 F.3d at 387 (responding to a request to search with "you've got the badge, I guess you can" is not a specific and unequivocal statement of consent to search). Trevino then testified, "As a result of his response, I stated that we needed to get his identification to verify who he was since he was lying to us." The Court finds that, after learning the identification was locked inside the house, Trevino's command that the police (either alone or with Cole) "needed" to retrieve Cole's identification from inside the house is not clear and positive testimony that Cole was *asked* if the police could enter the house to retrieve the identification. Rather, Cole was *told* that the identification must be retrieved. *See, e.g., United States v. Morales*, 171 F.3d 978, 980 (5th Cir.1999) (stating "police, open the door" in an authoritative manner is an order, not a request); *Gorman v. United States*, 380 F.2d 158, 163 (1st Cir.1967) (in order to be "asked" for consent, there must be some suggestion that an objection is significant or that the search waits upon consent). On cross-examination, Trevino stated "I asked him numerous times outside that I needed to see his ID." The Court also finds use of the word "need" again prevents this statement from being clear and positive testimony that Cole was *asked* for his consent to allow the police to enter the house to search for and retrieve

the identification, as opposed to being *told* that the identification needed to be retrieved. *See id.* Brightenstein, the only other witness that testified in the hearing, did not clarify whether Cole was asked for consent to allow the police to enter the house or whether Cole was simply told that the police needed to see the identification locked inside the house.

Accordingly, without clear and positive testimony that Cole was specifically asked if he would consent to the police searching for and retrieving (or accompanying Cole to search for and retrieve) his identification inside the house, the Court finds that the Government has only shown that Cole was simply *told* that the police *needed* to see his identification, a command that was reiterated even after the police learned his identification was locked inside. *See, e.g., Worley*, 193 F.3d at 387; *Price*, 925 F.2d at 1270; *Shaibu*, 920 F.2d at 1426.

Furthermore, because the Government has not shown by clear and positive testimony that Cole specifically and unequivocally told the police they could enter his house (either with or without Cole) to search for and retrieve the identification, the Court finds that any consent given by Cole in this case must be based upon his silence or lack of resistance to police action. *See, e.g., Worley*, 193 F.3d at 387; *Price*, 925 F.2d at 1270; *Shaibu*, 920 F.2d at 1426; *see also Zertuche–Tobias*, 953 F.Supp. at 827 (statement explaining location of an object does not in itself indicate consent for police to search object beyond scope of their lawful authority).

In addition, there was no testimony that Trevino asked Cole's consent to check to see if the front door was unlocked. Instead, Trevino testified, "I said I was going to go check the front door." The Court finds this to be a statement of Trevino's intent as opposed to a request for consent Cole reasonably felt he could refuse. *See, e.g., United States v. Baro*, 15 F.3d 563, 567 (6th Cir. 1994) (defendant did not consent to seizure of $14,190 agent took, given agent's "matter-of-fact declaration" that "I'm going to take this currency"); *United States v. Vasquez*, 638

---

1. To date, no transcript of the evidentiary hear-     ing has been prepared.

F.2d 507, 526–27 (2d Cir.1980) (police told defendant they were going to take him to his home to arrest his wife; defendant did not consent as the matter was "presented to him as a fait accompli"). There was also no testimony that Trevino ever asked Cole if he could enter the house through the front door to unlock the back door. Indeed, Trevino did not even decide to go through the front door without Cole until he determined it was unlocked. Finally, there was no testimony that Cole stated that Trevino had consent to check the front door or enter through the front door to unlock the back door. Thus, the Court finds that any consent with regard to Trevino checking or entering through the front door must be based upon Cole's silence or failure to resist the police's actions after being told what some of those actions would be and not discovering other of those actions until after they had already occurred. The Court also finds that, based on the testimony, when Trevino unlocked the back door from inside, Cole was not specifically *asked* if the basement could be searched for the identification, but rather was *told* by Trevino, "Well, the door's unlocked. I want you to get your ID." *See, e.g., United States v. Mapp*, 476 F.2d 67, 78 (2d Cir.1973) (when the police told a woman at her apartment that "we want the package," this "was an outright demand-without ifs, ands or buts"); 3 Wayne R. LaFave, Search and Seizure–A Treatise on the Fourth Amendment § 8.2(a) at 642 (1996) (when the police state that they "want" to undertake some activity, this is often an imperative statement and not a question requesting consent).

It is well established that a defendant's mere acquiescence to a show of lawful authority is insufficient to establish voluntary consent. *See, e.g., Bumper v. North Carolina*, 391 U.S. 543, 548–49, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1969); *United States v. Jaras*, 86 F.3d 383, 390 (5th Cir.1996) (collecting cases). Concerning Cole's silence or lack of resistance in the face of Trevino's statements that he "wanted" Cole to get his identification, that the police "needed" to see Cole's identification and that Trevino was "going to check the front door," the Court finds Cole's silence or lack of resistance in response to these directives not to be actions of voluntary consent but instead mere acquiescence to a show of lawful authority. *See, e.g., Morales*, 171 F.3d at 980 (when police banged on door of warehouse and stated "police, open the door," the officers had issued an order as opposed to a request, and thus opening of door was not by voluntary consent); *United States v. Pena–Saiz*, 161 F.3d 1175, 1176–78 (8th Cir.1998) (pat-down search not by voluntary consent where, after defendant was stopped, officer stated, "This is what we do. We talk to people, we search people's bags, we search people."); *Baro*, 15 F.3d 563, 567 (6th Cir.1994) (defendant did not consent to seizure of money agent took from him, given agent's "matter-of-fact declaration" that "I'm going to take this currency"); *United States v. $53,082.00*, 985 F.2d 245, 248 (6th Cir.1993) (acquiescence and not consent when "told" money would be seized is not consent because there is no suggestion of choice to refuse); *Vasquez*, 638 F.2d 507 (2d Cir.1980) (when police told defendant they were going to take him home to arrest his wife, defendant did not consent to entry, as the matter was "presented to him as a fait accompli"); *Mapp*, 476 F.2d at 78 (2d Cir.1973) (when police told woman at her apartment that "we want the package" consent was not voluntary, in part because this "was an outright demand—without ifs, ands or buts"); *Commonwealth v. Krisco Corp.*, 421 Mass. 37, 653 N.E.2d 579, 585 (1995) (consent was "nothing more than acquiescence to show of lawful authority" where agent said she "was on the premises for the purpose of making an administrative inspection"); 3 Wayne R. LaFave, Search and Seizure—A Treatise on the Fourth Amendment § 8.2(a) at 642 (1996) (when the police state that they "want" to undertake some activity, agreement to such an imperative statement is often seen as submission to a claim of authority). Thus, the Court finds Cole's silence or lack of resistance was not voluntary consent, but rather acquiescence to a claim of lawful authority and thus not supportive of the police's entry to search for and retrieve the identification. *See, e.g., Bumper*, 391 U.S. at 548–49, 88 S.Ct. 1788.

The Court also finds no voluntary consent in the instant case specifically be-

cause it involved entry and search of a home. Indeed, because the police's statements to Cole were not specific requests by the police to enter and search inside a home, but instead were directives or statements of the officers' intent to enter and search inside a home, Cole's silence or lack of resistance was not voluntary consent because "in the absence of a specific request by the police for permission to enter a home, a defendant's failure to object to such entry is not sufficient to establish free and voluntary consent." *Shaibu*, 920 F.2d at 1427; *see also United States v. Gonzalez*, 71 F.3d 819, 829–30 (11th Cir.1996) ("whatever relevance the implied consent [also known as inferred consent or consent by silence] doctrine may have in other contexts, it is inappropriate to sanction entry into the home based upon inferred consent") (citations omitted).

■ At this point, the Court notes that the above findings and conclusions assume that Cole did not resist the officers attempt to enter the house and search the basement for the identification. However, the Court also finds that Cole did resist the officers' entry and search for the identification, at least to the limited extent of attempting to proceed upstairs away from the incriminating evidence in the basement before being grabbed by Trevino and led back toward downstairs. When Trevino grabbed Cole and stated, "You said your ID was downstairs. Why are you going upstairs?", Trevino first testified that Cole said something to the extent of "it is" but then testified that he couldn't exactly recall what Cole stated. The Court finds Trevino's failure to testify clearly as to how Trevino concluded that Cole was not attempting to revoke what Trevino had earlier determined, albeit wrongly, to be Cole's consent is further evidence that the government has not shown by clear and positive testimony that consent was voluntary. *See, e.g., Price*, 925 F.2d at 1270; *Shaibu*, 920 F.2d at 1425.

The Court also finds Cole's brief resistance in attempting to proceed, and thus lead, the officers away from the basement a significant factor further militating against a finding of consent. *United States v. Cooper*, 43 F.3d 140, 144 (5th Cir.1995) (extent of the

defendant's cooperation with the police is one of six main factors in determining voluntariness of consent); *United States v. Morin*, 949 F.2d 297, 300 (10th Cir.1991) (existence or non-existence of voluntary cooperation considered in determining voluntariness of consent). The Court also finds four other factors militate against finding voluntary consent. First, Trevino grabbing Cole in itself contributes to a finding of coercion, subtle or overt, precluding voluntary consent. *See, e.g., United States v. Sanchez*, 156 F.3d 875, 878 (8th Cir.1998); *United States v. Averitte*, No. 91–2276, 1992 WL 322198, at *2 (10th Cir. Nov.5, 1992) (both considering whether officers physically touched defendant in determining voluntariness of consent). Second, the Court finds Cole was aware that the police would find the incriminating evidence of drugs upon entering the basement, for the drugs were in plain site in the basement from which he had come when the police arrived. This fact also militates against a finding of voluntary consent. *See, e.g., Jenkins*, 46 F.3d at 451 (stressing the defendant's belief as to whether incriminating evidence would be found as a main factor in determining voluntary consent). Third, the Court finds that Trevino used a demanding tone by the choice of words he used when, after grabbing Cole, he asked him why he was going upstairs if the identification was downstairs. This also contributes toward a finding of subtle or overt coercion precluding voluntary consent. *United States v. Sanchez–Valderuten*, 11 F.3d 985, 990 (10th Cir.1993) (officer's polite manner and lack of demanding tone considered in finding consent voluntary); *United States v. Talkington*, 843 F.2d 1041, 1049 (7th Cir.1988) (loud or mean demeanor considered in determining voluntariness of consent). Fourth, the fact that the officers did not advise Cole of his right to refuse consent also contributes toward a finding that Cole did not voluntarily consent. Indeed, in *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), the Supreme Court stressed the importance of expressly telling a person he is free to decline consent, not only because it establishes the person is aware of the right to refuse, but "perhaps more important" because the fact

that the officers themselves informed the person that he is free to withhold consent substantially lessen the probability that the officers' conduct could reasonably appear to him to be coercive. 446 U.S. at 558, 100 S.Ct. 1870; *cf. United States v. Valencia,* 913 F.2d 378, 381 (7th Cir.1990) (finding "perhaps most significantly" in finding voluntary consent to search that the suspect was informed of and indicated she understood her right to refuse consent). While the Court notes that Cole exercised his right to refuse consent to a search of the entire house after the police discovered the drugs and gun in the basement, this refusal was made after Cole was actually *asked* for his consent to search the house. Earlier, as the Court has already discussed, Cole was not asked for consent but told that the police "wanted" and "needed" his identification, and his failure to deny consent at that time was nothing more than acquiescence to a claim of lawful authority. *See, e.g., United States v. $53,-082.00,* 985 F.2d 245, 248 (6th Cir.1993). In any event, any awareness by Cole of his right to refuse consent earlier is only one factor, which is not dispositive, and which this Court finds outweighed by the factors already discussed. *Schneckloth,* 412 U.S. at 227, 93 S.Ct. 2041. As a final matter, the Court notes there was no testimony as to Cole's age, education, or intelligence, another frequently considered factor in determining voluntary consent.

In conclusion, the Court relies upon the following factors to determine that, under the totality of the circumstances, Cole did not give voluntary consent to the search or seizure of his identification in the house: first, Cole was never asked for his consent but merely told that the police "wanted" or "needed" to see his identification, even after they learned it was locked in the house; second, Cole never gave affirmative consent for the search or seizure of his identification in the house, but instead merely remained silent or failed to resist the officer's efforts to enter the house to search for and seize the identification, resulting in no voluntary consent but instead acquiescence to a show of lawful authority; third, the entry and search involved a home, where police must specifically request to enter before silence will be

treated as consent; fourth, Cole attempted to resist the search of the basement by going upstairs when the officers lead him toward the basement; fifth, Trevino physically grabbed Cole to lead him back toward the basement, an indication of at least subtle, and quite possibly overt, coercion; sixth, Trevino spoke in a demanding tone by his choice of words when physically preventing Cole from going upstairs away from the basement; seventh, Cole knew that the police would discover incriminating evidence in plain view in the basement; and eighth, the police failed to inform Cole of his right to refuse consent.

Based on these factors, the Court FINDS that Cole did not give voluntary consent for the officers to enter and search for or seize his identification in the house; instead, any consent given was the product of duress or coercion, express or implied. *Schneckloth,* 412 U.S. at 227, 93 S.Ct. 2041. A reasonable person in Cole's position would not have felt free to deny consent. *United States v. Withers,* 972 F.2d 837, 841 (7th Cir.1992). Thus, the Government cannot prevail on its theory that the warrantless search of the house and subsequent seizure of items was based upon voluntary consent.

*Exigent Circumstances*

The Government's second theory to justify the warrantless intrusion into the basement, which lead to seizure of the gun and drugs, is exigent circumstances. As stated earlier, because physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed, searches and seizures inside the home are presumptively unreasonable. *Payton v. New York,* 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *United States v. United States District Court,* 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972). In the absence of consent, a warrantless search or seizure is "per se unreasonable unless the police can show that it falls within one of a carefully defined set of exceptions based on the presence of 'exigent circumstances.'" *Coolidge v. New Hampshire,* 403 U.S. 443, 474–75, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1981). The government bears "a heavy burden when attempting to demonstrate an urgent need" to make a warrantless search. *Welsh v. Wis-*

*consin,* 466 U.S. 740, 749–50, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984).

▇▇▇▇ Exigent circumstances are those in which a substantial risk of harm to the persons involved or to the law enforcement process would arise if the police were to delay a search until a warrant could be obtained. *See, e.g., United States v. Gooch,* 6 F.3d 673, 678 (9th Cir.1993). Exigent circumstances are present when a reasonable person would believe that entry was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, or some other consequence improperly frustrating law enforcement efforts. *Id.*

▇▇▇ In *United States v. Napue,* 834 F.2d 1311 (7th Cir.1987), the Seventh Circuit held that arresting officers may make a warrantless entry into a premises under the exigent circumstances exception to the warrant requirement when, following an arrest outside the premises, the arresting officers have (1) a reasonable belief that third persons are inside, and (2) a reasonable belief that the third persons are aware of the arrest outside the premises so that they might destroy evidence, escape or jeopardize the safety of others. 834 F.2d at 1327; *United States v. Bennett,* 908 F.2d 189, 192 (7th Cir.1990).

▇▇▇ Applying this test in the instant case, the Court finds exigent circumstances did not exist for the police to enter the basement to search for and seize the gun or drugs. Trevino testified that after he walked through the house to the back door, he had satisfied himself that no one was in the house. Furthermore, there was no testimony of any particular facts leading the officers to otherwise believe that someone was still in the house. For instance, the evidence did not show that Cole had called back into the house to anyone when initially stepping out the back door to meet the police, nor did anyone testify as to sounds coming from the house while the police were outside with Cole. Finally, Trevino testified that at the point he unlocked the back door before the officers proceeded down to the basement, there was nothing preventing him from obtaining a search warrant if his intention was to either retrieve the gun or the drugs from

the basement. Such a warrant, Trevino testified, could have been obtained in an hour or less.

When asked on cross examination if he had any reason to believe anyone was in the basement, Trevino provided no reason that he may have had to believe someone was in the basement. Instead, he merely stated he was not sure if someone was in the basement. However, the Court finds this statement does not satisfy the Government's burden to show Trevino had the requisite *reasonable* basis for believing someone was in the basement or elsewhere in the house, justifying exigent circumstances. *See, e.g., Vale v. Louisiana,* 399 U.S. 30, 34, 90 S.Ct. 1969, 26 L.Ed.2d 409 (arrest outside the home did not justify a warrantless search and seizure on the assumption that evidence was likely to be destroyed, for the police had already satisfied themselves no one was in the house); *United States v. Agapito,* 620 F.2d 324, 336 (2d Cir.1980) (entry unlawful because agents did not hear or see anyone else and had no other basis for believing someone was present).

The officers' actions in proceeding into the basement further indicate that they did not have a reasonable basis for believing any threat lurked in the house. Cole proceeded into the basement second in line and not handcuffed, and Brightenstein did not have her weapon drawn. Furthermore, there was no testimony that Trevino or Upshaw had their weapons drawn when going downstairs; the only one who testified on the matter was Brightenstein, who could not remember whether Trevino or Upshaw had his weapon drawn. The Court suspects that if the officers truly had a reasonable belief for suspecting someone was in the basement, the officers would not have allowed an uncuffed suspect to enter with them in such a manner.

The Court also notes the Government cannot rely on the mere presence of a gun or drugs in the basement in meeting its burden of showing exigent circumstances. *See, e.g., United States v. Johnson,* 22 F.3d 674, 680 (6th Cir.1994) (reversing a finding of exigent circumstances based merely on the presence of guns without any indication that the kidnappers were in the house); *United States v. Stewart,* 867 F.2d 581, 585 (10th Cir.1989)

(generalized information about characteristics of drug trafficking alone will not support exigent circumstances); *United States v. Munoz–Guerra,* 788 F.2d 295, 298 (5th Cir. 1986) (stressing, and listing cases holding, that "the mere presence of firearms or destructible incriminating evidence does not create exigent circumstances").

Accordingly, the Court finds no evidence that, at the point the officers proceeded downstairs and seized the gun and drugs, the officers had a reasonable belief someone else was in the house, let alone a reasonable belief that someone inside the house was aware of the activities taking place outside the house such that evidence was about to be destroyed or lives endangered. *Napue,* 834 F.2d at 1327. There is thus no evidence that exigent circumstances created an urgent need that prevented the police from waiting for a warrant, which could have been obtained in an hour or less. *See, e.g., Bennett,* 908 F.2d at 192. The Government cannot prevail on exigent circumstances to excuse the warrant requirement.

*Fruit of the Poisonous Tree*

Because the Government cannot prevail on either of its theories for not obtaining a warrant before searching for and seizing the gun and drugs in the basement, these items are suppressed. *Coolidge,* 403 U.S. at 474–75, 91 S.Ct. 2022. Furthermore, because the Government has produced no evidence that Cole's statements made in the basement after his arrest, or any other evidence obtained as a result of the illegal search and seizure, were not tainted by the unconstitutional search for and seizure of the gun and drugs, all of this evidence is also suppressed. *Wong Sun v. United States,* 371 U.S. 471, 484–85, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *United States v. Johnson,* 708, 714 (7th Cir.1999).

*CONCLUSION*

For the reasons set forth above, the Motion to Suppress Evidence is **GRANTED**. The Court **ORDERS** that all evidence seized from inside the 1124 Jennings Street residence at the time of and subsequent to Cole's arrest, in addition to all evidence obtained as a result of the illegal search and seizure, be **SUPPRESSED**.